BLAU *v.* LEHMAN ET AL.

No. 66.   Argued December 12–13, 1961.—Decided January 22, 1962.

*Morris J. Levy* argued the cause and filed briefs for petitioner.

*Whitney North Seymour* argued the cause for respondents other than Tide Water Associated Oil Company. With him on the briefs were *Benjamin C. Milner* and *Robert S. Carlson.*

*Allan F. Conwill*, by special leave of Court, argued the cause for the Securities and Exchange Commission, as *amicus curiae,* urging reversal. With him on the briefs were *Solicitor General Cox, John F. Davis, Walter P. North, Ellwood L. Englander* and *David Ferber.*

*Bruce Bromley* filed a brief for the American Society of Corporate Secretaries, Inc., as *amicus curiae,* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner Blau, a stockholder in Tide Water Associated Oil Company, brought this action in a United States District Court on behalf of the company under § 16 (b) [1] of the Securities Exchange Act of 1934 to

---

[1] "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously con-

recover with interest "short swing" profits, that is, profits earned within a six months' period by the purchase and sale of securities, alleged to have been "realized" by respondents in Tide Water securities dealings. Respondents are Lehman Brothers, a partnership engaged in investment banking, securities brokerage and in securities trading for its own account, and Joseph A. Thomas, a member of Lehman Brothers and a director of Tide Water. The complaint alleged that Lehman Brothers "deputed . . . Thomas, to represent its interests as a director on the Tide Water Board of Directors," and that within a period of six months in 1954 and 1955 Thomas, while representing the interests of Lehman Brothers as a director of Tide Water and "by reason of his special and inside knowledge of the affairs of Tide Water, advised and caused the defendants, Lehman Brothers, to purchase and sell 50,000 shares of . . . stock of Tide Water, realizing profits thereon which did not inure to and [were] not recovered by Tide Water."

The case was tried before a district judge without a jury. The evidence showed that Lehman Brothers had in

tracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 48 Stat. 896, 15 U. S. C. § 78p (b).

fact earned profits out of short-swing transactions in Tide Water securities while Thomas was a director of that company. But as to the charges of deputization and wrongful use of "inside" information by Lehman Brothers, the evidence was in conflict.

First, there was testimony that respondent Thomas had succeeded Hertz, another Lehman partner, on the board of Tide Water; that Hertz had "joined Tidewater Company thinking it was going to be in the interests of Lehman Brothers"; and that he had suggested Thomas as his successor partly because it was in the interest of Lehman. There was also testimony, however, that Thomas, aside from having mentioned from time to time to some of his partners and other people that he thought Tide Water was "an attractive investment" and under "good" management, had never discussed the operating details of Tide Water affairs with any member of Lehman Brothers;[2] that Lehman had bought the Tide Water securities without consulting Thomas and wholly on the basis of public announcements by Tide Water that common shareholders could thereafter convert their shares to a new cumulative preferred issue; that Thomas did not know of Lehman's intent to buy Tide Water stock until after the initial purchases had been made; that upon learning about the purchases he immediately notified Lehman that he must be excluded from "any risk of the purchase or any profit or loss from the subsequent sale"; and that this disclaimer was accepted by the firm.[3]

---

[2] In 1956, after the purchase and sale in question, Lehman Brothers participated in the underwriting of some Tide Water bonds. Thomas handled this for Lehman and during the course of the matter discussed Tide Water affairs with the other members of Lehman.

[3] In compliance with § 16 (a) and the rules and forms thereunder, see note 14, *infra*, Thomas filed with the SEC reports of the Lehman transactions in Tide Water stock and his disclaimer of those transactions.

From the foregoing and other testimony the District Court found that "there was no evidence that the firm of Lehman Brothers deputed Thomas to represent its interests as director on the board of Tide Water" and that there had been no actual use of inside information, Lehman Brothers having bought its Tide Water stock "solely on the basis of Tide Water's public announcements and without consulting Thomas."

On the basis of these findings the District Court refused to render a judgment, either against the partnership or against Thomas individually, for the $98,686.77 profits which it determined that Lehman Brothers had realized,[4] holding:

> "The law is now well settled that the mere fact that a partner in Lehman Brothers was a director of Tide Water, at the time that Lehman Brothers had this short swing transaction in the stock of Tide Water, is not sufficient to make the partnership liable for the profits thereon, and that Thomas could not be held liable for the profits realized by the other partners from the firm's short swing transactions. Rattner v. Lehman, 2 Cir., 1952, 193 F. 2d 564, 565, 567. This precise question was passed upon in the Rattner decision." 173 F. Supp. 590, 593.

Despite its recognition that Thomas had specifically waived his share of the Tide Water transaction profits, the trial court nevertheless held that within the meaning of § 16 (b) Thomas had "realized" $3,893.41, his proportionate share of the profits of Lehman Brothers. The court consequently entered judgment against Thomas for that amount but refused to allow interest against him.

---

[4] In both courts below defendants claimed that Lehman's profits should have been found to be much less than they were. Since the determination below has not been complained of here, it is not necessary to pass on those contentions.

On appeal, taken by both sides, the Court of Appeals for the Second Circuit adhered to the view it had taken in *Rattner* v. *Lehman,* 193 F. 2d 564, and affirmed the District Court's judgment in all respects, Judge Clark dissenting. 286 F. 2d 786. The Securities and Exchange Commission then sought leave from the Court of Appeals *en banc* to file an *amicus curiae* petition for rehearing urging the overruling of the *Rattner* case. The Commission's motion was denied, Judges Clark and Smith dissenting. We granted certiorari on the petition of Blau, filed on behalf of himself, other stockholders and Tide Water, and supported by the Commission. 366 U. S. 902. The questions presented by the petition are whether the courts below erred: (1) in refusing to render a judgment against the Lehman partnership for the $98,686.77 profits they were found to have "realized" from their "short-swing" transactions in Tide Water stock, (2) in refusing to render judgment against Thomas for the full $98,686.77 profits, and (3) in refusing to allow interest on the $3,893.41 recovery allowed against Thomas.[5]

Petitioner apparently seeks to have us decide the questions presented as though he had proven the allegations of his complaint that Lehman Brothers actually deputized Thomas to represent its interests as a director of Tide Water, and that it was his advice and counsel based on his special and inside knowledge of Tide Water's affairs that caused Lehman Brothers to buy and sell Tide Water's stock. But the trial court found otherwise and the Court of Appeals affirmed these findings. Inferences could per-

---

[5] In the two courts below it was contended both that Thomas, because of his disclaimer of all participation in these partnership transactions, had realized no profits at all, and also that, even if he did realize some profits the amount was less than that found. See the opinion of Judge Swan dissenting in part below. 286 F. 2d, at 793. We express no view on these questions since the Thomas judgment is not challenged here.

haps have been drawn from the evidence to support petitioner's charges, but examination of the record makes it clear to us that the findings of the two courts below were not clearly erroneous. Moreover, we cannot agree with the Commission that the courts' determinations of the disputed factual issues were conclusions of law rather than findings of fact. We must therefore decide whether Lehman Brothers, Thomas or both have an absolute liability under § 16 (b) to pay over all profits made on Lehman's Tide Water stock dealings even though Thomas was not sitting on Tide Water's board to represent Lehman and even though the profits made by the partnership were on its own initiative, independently of any advice or "inside" knowledge given it by director Thomas.

*First.* The language of § 16 does not purport to impose its extraordinary liability on any "person," "fiduciary" or not, unless he or it is a "director," "officer" or "beneficial owner of more than 10 percentum of any class of any equity security . . . which is registered on a national securities exchange." [6] Lehman Brothers was neither an officer nor a 10% stockholder of Tide Water, but petitioner and the Commission contend that the Lehman partnership is or should be treated as a director under § 16 (b).

(a) Although admittedly not "literally designated" as one, it is contended that Lehman is a director. No doubt Lehman Brothers, though a partnership, could for purposes of § 16 be a "director" of Tide Water and function through a deputy, since § 3 (a)(9) of the Act [7] provides that " 'person' means . . . partnership" and § 3 (a)(7) [8] that " 'director' means any director of a corporation or any person performing similar functions with respect to any organization, whether incorporated or unincorporated."

---

[6] See § 16 (a), 48 Stat. 896, 15 U. S. C. § 78p (a).

[7] 48 Stat. 883, 15 U. S. C. § 78c (a)(9).

[8] 48 Stat. 883, 15 U. S. C. § 78c (a)(7).

Consequently, Lehman Brothers would be a "director" of Tide Water, if as petitioner's complaint charged Lehman actually functioned as a director through Thomas, who had been deputized by Lehman to perform a director's duties not for himself but for Lehman. But the findings of the two courts below, which we have accepted, preclude such a holding. It was Thomas, not Lehman Brothers as an entity, that was the director of Tide Water.

(b) It is next argued that the intent of § 3 (a)(9) in defining "person" as including a partnership is to treat a partnership as an inseparable entity.[9] Because Thomas, one member of this inseparable entity, is an "insider," [10] it is contended that the whole partnership should be considered the "insider." But the obvious intent of § 3 (a)(9), as the Commission apparently realizes, is merely to make it clear that a partnership can be treated as an entity under the statute, not that it must be. This affords no reason at all for construing the word "director" in § 16 (b) as though it read "partnership of which the director is a member." And the fact that Congress provided in § 3 (a)(9) for a partnership to be treated as an entity in its own right likewise offers no support for the argument that Congress wanted a partnership to be subject to all the responsibilities and financial burdens of its members in carrying on their other individual business activities.

(c) Both the petitioner and the Commission contend on policy grounds that the Lehman partnership should be held liable even though it is neither a director, officer, nor

---

[9] The Commission's brief says: "Therefore, when a member of a partnership holds a directorship with the knowledge and consent of his firm, it is entirely reasonable to consider the partnership as the 'director' for the purposes of Section 16 (b)."

[10] An "insider" for purposes of § 16 is an officer, director or 10% stockholder. See Cook and Feldman, Insider Trading Under the Securities Exchange Act, 66 Harv. L. Rev. 385, 399–404.

a 10% stockholder. Conceding that such an interpretation is not justified by the literal language of § 16 (b) which plainly limits liability to directors, officers, and 10% stockholders, it is argued that we should expand § 16 (b) to cover partnerships of which a director is a member in order to carry out the congressionally declared purpose "of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer . . . ." Failure to do so, it is argued, will leave a large and unintended loophole in the statute—one "substantially eliminating the great Wall Street trading firms from the statute's operation." 286 F. 2d, at 799. These firms it is claimed will be able to evade the Act and take advantage of the "inside" information available to their members as insiders of countless corporations merely by trading "inside" information among the various partners.

The argument of petitioner and the Commission seems to go so far as to suggest that § 16 (b)'s forfeiture of profits should be extended to include all persons realizing "short swing" profits who either act on the basis of "inside" information or have the possibility of "inside" information. One may agree that petitioner and the Commission present persuasive policy arguments that the Act should be broadened in this way to prevent "the unfair use of information" more effectively than can be accomplished by leaving the Act so as to require forfeiture of profits only by those specifically designated by Congress to suffer those losses.[11] But this very broadening of the categories of persons on whom these liabilities are imposed by the

---

[11] *Mosser* v. *Darrow*, 341 U. S. 267, and *Lehman* v. *Civil Aeronautics Board*, 93 U. S. App. D. C. 81, 209 F. 2d 289, cited by the Commission as comparable situations throw little if any light on the issues in this case. Those cases involved different facts and different statutes, statutes which themselves have different language, purpose and history from the statute here.

language of § 16 (b) was considered and rejected by Congress when it passed the Act. Drafts of provisions that eventually became § 16 (b) not only would have made it unlawful for any director, officer or 10% stockholder to disclose any confidential information regarding registered securities, but also would have made all profits received by *anyone,* "insider" or not, "to whom such unlawful disclosure" had been made recoverable by the company.[12]

Not only did Congress refuse to give § 16 (b) the content we are now urged to put into it by interpretation, but with knowledge that in 1952 the Second Circuit Court of Appeals refused, in the *Rattner* case, to apply § 16 (b) to Lehman Brothers in circumstances substantially like

---

[12] Thus, § 15 (b) of both H. R. 7852, and S. 2693, 73d Cong., 2d Sess. provided:

"(b) *It shall be unlawful for any director,* officer, or owner of securities, owning as of record and/or beneficially more than 5 per centum of any class of stock of any issuer, and security of which is registered on a national securities exchange . . . (*3*) *To disclose, directly or indirectly, any confidential information regarding or affecting any such registered security* not necessary or proper to be disclosed as a part of his corporate duties. *Any profit made by any person, to whom such unlawful disclosure shall have been made,* in respect of any transaction or transactions in such registered security within a period not exceeding six months after such disclosure *shall inure to and be recoverable by the issuer* unless such person shall have had no reasonable ground to believe that the disclosure was confidential or was made not in the performance of corporate duties. . . ." (Emphasis added.)

As to the meaning ascribed to this provision, see Hearings before the Committee on Banking and Currency on S. Res. No. 84, 72d Cong., 2d Sess., and S. Res. Nos. 56 and 97, 73d Cong., 1st and 2d Sess. 6555, 6558, 6560–6561; Hearings before Committee on Interstate and Foreign Commerce on H. R. 7852 and H. R. 8720, 73d Cong., 2d Sess. 135–137. These hearings seem to indicate that the provision was omitted from the final act because of anticipated problems of administration. See also *Smolowe* v. *Delendo Corp.,* 136 F. 2d 231, 236; *Rattner* v. *Lehman,* 193 F. 2d 564.

those here, Congress has left the Act as it was.[13]   And so far as the record shows this interpretation of § 16 (b) was the view of the Commission until it intervened last year in this case.   Indeed in the *Rattner* case the Court of Appeals relied in part on Commission Rule X–16A–3 (b) which required insider-partners to report only the amount of their own holdings and not the amount of holdings by the partnership.   While the Commission has since changed this rule to require disclosure of partnership holdings too, its official release explaining the change stated that the new rule was "not intended as a modification of the principles governing liability for short-swing transactions under Section 16 (b) as set forth in the case of *Rattner* v. *Lehman* . . . ."[14]   Congress can and might amend § 16 (b) if the Commission would present to it the policy arguments it has presented to us, but we think that Congress is the proper agency to change an interpretation of the Act unbroken since its passage, if the change is to be made.

*Second.* The petitioner and the Commission contend that Thomas should be required individually to pay to Tide Water the entire $98,686.77 profit Lehman Brothers realized on the ground that under partnership law he is co-owner of the entire undivided amount and has therefore "realized" it all.   "[O]nly by holding the partner-director liable for the *entire* short-swing profits realized by his firm," it is urged, can "an effective prophylactic to the stated statutory policy . . . be fully enforced."   But

---

[13] See Seventeenth Annual Report of the Securities and Exchange Commission, p. 62 (1952); Eighteenth Annual Report, p. 79 (1953). These reports were submitted to Congress.

[14] Securities and Exchange Commission Release No. 4754 (September 24, 1952).   Rule X–16A–3 was again amended, effective March 9, 1961, to delete any requirements that a partner report the amount of the issuer's securities held by the partnership but the substance of the rule is still contained in the Commission's instructions to its Forms 3 and 4 which are used for making the reports required under § 16 (a).

liability under § 16 (b) is to be determined neither by general partnership law nor by adding to the "prophylactic" effect Congress itself clearly prescribed in § 16 (b). That section leaves no room for judicial doubt that a director is to pay to his company only "any profit realized *by him*" from short-swing transactions. (Emphasis added.) It would be nothing but a fiction to say that Thomas "realized" all the profits earned by the partnership of which he was a member. It was not error to refuse to hold Thomas liable for profits he did not make.

*Third.* It is contended that both courts below erred in failing to allow interest on the recovery of Thomas' share of the partnership profits. Section 16 (b) says nothing about interest one way or the other. This Court has said in a kindred situation that "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." *Board of Commissioners* v. *United States,* 308 U. S. 343, 352. Both courts below denied interest here and we cannot say that the denial was either so unfair or so inequitable as to require us to upset it.

*Affirmed.*

MR. JUSTICE STEWART took no part in the disposition of this case.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE concurs, dissenting.

What the Court does today is substantially to eliminate "the great Wall Street trading firms" from the operation of § 16 (b), as Judge Clark stated in his dissent in the Court of Appeals. 286 F. 2d 786, 799. This result follows because of the wide dispersion of partners of investment banking firms among our major corporations. Lehman Bros. has partners on 100 boards. Under today's

ruling that firm can make a rich harvest on the "inside information" which § 16 of the Act covers because each partner need account only for his distributive share of the firm's profits on "inside information," the other partners keeping the balance. This is a mutilation of the Act.

If a partnership can be a "director" within the meaning of § 16 (a), then "any profit realized by him," as those words are used in § 16 (b), includes all the profits, not merely a portion of them, which the partnership realized on the "inside information." There is no basis in reason for saying a partnership cannot be a "director" for purposes of the Act. In *Rattner* v. *Lehman*, 193 F. 2d 564, 567,[1] Judge Learned Hand said he was "not prepared to say" that a partnership could not be considered a "director," adding "for some purposes the common law does treat a firm as a jural person." In his view a partnership might be a "director" within the meaning of § 16 if it "deputed a partner" to represent its interests. Yet formal designation is no more significant than informal approval. Everyone knows that the investment banking-corporation alliances are consciously constructed so as to increase the profits of the bankers. In partnership law a debate has long raged over whether a partnership is an

---

[1] The *Rattner* decision was rendered at a time when the Securities and Exchange Commission, pursuant to its regulatory power, provided a reporting requirement for § 16 (a) which allowed a partner-director to disclose only that amount of the equity securities of the corporation in question held by his partnership and representing his proportionate interest in the partnership. Rule X–16A–3. After the *Rattner* decision that Rule was amended to read:
"A partner who is required under § 240.16a–1 to report in respect of any equity security owned by the partnership shall include in his report the entire amount of such equity security owned by the partnership. He may, if he so elects, disclose the extent of his interest in the partnership and the partnership transactions." 17 CFR, 1961 Cum. Supp., § 240.16a–3 (b). See Loss, Securities Regulation, Vol. 2, pp. 1102–1104 (1961).

entity or an aggregate. Pursuit of that will-o'-the-wisp is not profitable. For even New York with its aggregate theory recognizes that a partnership is or may be considered an entity for some purposes.[2] It is easier to make this partnership a "director" for purposes of § 16 than to hold the opposite. Section 16 (a) speaks of every "person" who is a "director." In § 3 (a)(9) "person" is defined to include, *inter alia,* "a partnership."[3] Thus, the purpose to subject a partnership to the provisions of § 16 need not turn on a strained reading of that section.

At the root of the present problem are the scope and degree of liability arising out of fiduciary relations. In modern times that liability has been strictly construed. The New York Court of Appeals, speaking through Chief Judge Cardozo in *Meinhard* v. *Salmon,* 249 N. Y. 458, 164 N. E. 545, held a joint adventurer to a higher standard than we insist upon today:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee

---

[2] *Matter of Schwartzman,* 262 App. Div. 635, 636–637, 30 N. Y. S. 2d 882, 884, aff'd 288 N. Y. 568, 42 N. E. 2d 22, holding a partnership to be a legal entity for purposes of the Unemployment Insurance Law; *Mendelsohn* v. *Equitable Life Assurance Soc.,* 178 Misc. 152, 154, 33 N. Y. S. 2d 733, 735, holding "attorneys as partners are but one person" for purposes of the Rules of Civil Practice; *Travelers Ind. Co.* v. *Unger,* 4 Misc. 2d 955, 959, 158 N. Y. S. 2d 892, 896, holding a partnership "is to be regarded as a legal entity for the purposes of pleading." And see *Bernard* v. *Ratner,* 7 N. Y. S. 2d 717.

[3] In *United States* v. *A & P Trucking Co.,* 358 U. S. 121—a case far more severe in its impact than the result I urge here, as it held a partnership could be criminally liable under the Motor Carrier Act—the Court said, "Congress has specifically included partnerships within the definition of 'person' in a large number of regulatory Acts, thus showing its intent to treat partnerships as entities." *Id.,* p. 124, note 3.

is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (*Wendt* v. *Fischer*, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." 249 N. Y., at 464, 164 N. E., at 546.

In *Mosser* v. *Darrow*, 341 U. S. 267, we allowed a reorganization trustee to be surcharged $43,447.46 for profits made by his employees through trading in securities of subsidiaries of a bankrupt company. We made this ruling even though there was "no hint or proof that he has been corrupt or that he has any interest, present or future, in the profits he has permitted these employees to make." *Id.*, at 275. We said:

"These strict prohibitions would serve little purpose if the trustee were free to authorize others to do what he is forbidden. While there is no charge of it here, it is obvious that this would open up opportunities for devious dealings in the name of others that the trustee could not conduct in his own. The motives of man are too complex for equity to separate in the case of its trustees the motive of acquiring efficient help from motives of favoring help, for any reason at all or from anticipation of counterfavors later to come. We think that which the trustee had no right to do he had no right to authorize, and that

the transactions were as forbidden for benefit of others as they would have been on behalf of the trustee himself.

.        .        .        .        .

". . . equity has sought to limit difficult and deli-cate fact-finding tasks concerning its own trustee by precluding such transactions for the reason that their effect is often difficult to trace, and the prohibition is not merely against injuring the estate—it is against profiting out of the position of trust. That this has occurred, so far as the employees are concerned, is undenied." *Id.,* at 271–273.

It is said that the failure of Congress to take action to remedy the consequences of the *Rattner* case somehow or other shows a purpose on the part of Congress to infuse § 16 with the meaning that *Rattner* gave it. We took that course in *Toolson* v. *New York Yankees,* 346 U. S. 356, and adhered to a ruling the Court made in 1922 that baseball was not within the scope of the antitrust laws, because the business had been "left for thirty years to develop, on the understanding that it was not subject to" those laws. *Id.,* p. 357. Even then we had qualms and two Justices dissented. For what we said in *Girouard* v. *United States,* 328 U. S. 61, 69, represents our usual atti-tude: "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." [4]

---

[4] We said in *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118, 140–141:

"It is indulging in the merest fiction to suggest that the doctrine which for the first time we are asked to pronounce with our eyes open and in the light of full consideration, was so obviously and firmly part of the texture of our law that Congress in effect enacted it through its silence. There is no occasion here to regard the silence of Congress as more commanding than its own plainly and unmistak-ably spoken words. This is not a situation where Congress has failed to act after having been requested to act or where the circum-

It is ironic to apply the *Toolson* principle here and thus sanction, as vested, a practice so notoriously unethical as profiting on inside information.

We forget much history when we give § 16 a strict and narrow construction. Brandeis in *Other People's Money* spoke of the office of "director" as "a happy hunting ground" for investment bankers. He said that "The goose that lays golden eggs has been considered a most valuable possession. But even more profitable is the privilege of taking the golden eggs laid by somebody else's goose. The investment bankers and their associates now enjoy that privilege." *Id.,* at 12.

The hearings that led to the Securities Exchange Act of 1934 are replete with episodes showing how insiders exploited for their personal gain "inside information" which came to them as fiduciaries and was therefore an asset of the entire body of security holders. The Senate Report labeled those practices as "predatory operations." S. Rep. No. 1455, 73d Cong., 2d Sess., p. 68. It said:

> "Among the most vicious practices unearthed at the hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their market activities. Closely allied to this type of abuse was the unscrupulous employment of inside information by large stockholders who, while not

stances are such that Congress would ordinarily be expected to act. The provisions of § 265 have never been the subject of comprehensive legislative reëxamination. Even the exceptions referable to legislation have been incidental features of other statutory schemes, such as the Removal and Interpleader Acts. The explicit and comprehensive policy of the Act of 1793 has been left intact. To find significance in Congressional nonaction under these circumstances is to find significance where there is none."

directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others." *Id.*, at 55. See also S. Rep. No. 792, 73d Cong., 2d Sess., p. 9.

The theory embodied in § 16 was the one Brandeis espoused. It was stated by Sam Rayburn as follows: "Men charged with the administration of other people's money must not use inside information for their own advantage." H. R. Rep. No. 1383, 73d Cong., 2d Sess. 13.

What we do today allows all but one partner to share in the feast which the one places on the partnership table. They in turn can offer feasts to him in the 99 other companies of which they are directors.[5] 14 Stan. L. Rev. 192, 198. This result is a dilution of the fiduciary principle that Congress wrote into § 16 of the Act. It is, with all respect, a dilution that is possible only by a strained reading of the law. Until now, the courts have given this fiduciary principle a cordial reception. We should not leave to Congress the task of restoring the edifice that it erected and that we tear down.

---

[5] The proper approach to the problem of interlocking directorates through the agency of an investment banking house was expressed by Judge Fahy in *Lehman* v. *Civil Aeronautics Board*, 93 U. S. App. D. C. 81, 209 F. 2d 289, a case involving this same firm. See Appendix to this opinion.

APPENDIX TO OPINION OF
MR. JUSTICE DOUGLAS.

*Lehman* v. *Civil Aeronautics Board, supra,* 93 U. S. App.
D. C., at 85–87, 209 F. 2d, at 292–294.

"Petitioner Lehman is a director of Pan American; petitioner Joseph A. Thomas is a director of National Airlines, Inc., and of American Export Lines, Inc.; petitioner Frederick L. Ehrman is a director of Continental Air Lines, Inc., and Mr. John D. Hertz is a director of Consolidated Vultee Aircraft Corporation. All the companies referred to are in the aeronautic field and so must have Board approval of the kind of interlocking relationships which are made unlawful unless approved. Messrs. Lehman, Thomas, Ehrman, Hertz, and others, are also members of Lehman Brothers, a partnership which, as previously pointed out, conducts an investment banking business.

"The Board held that an individual Lehman Brothers partner who is a director of a Section 409 (a) company is a representative of another partner who is a director of another such company. The relationships thus found to exist were disapproved as to those involving Pan American and National; Pan American and American Export Lines; Pan American and Consolidated Vultee; National and Pan American; National and Consolidated Vultee; and Continental Air Lines and Consolidated Vultee. . . .

"More precisely the Board concluded that a Lehman Brothers partner who is director of an air carrier has a representative 'who represents such . . . director as . . . a director' in another Section 409 (a) company if another Lehman Brothers partner is a director of the latter, coupled with the circumstances that he seeks on behalf of Lehman Brothers the security underwriting and merger negotiation services used by the company of which he is director. The underwriting of security issues and the

conduct of merger negotiations constitute a substantial part of the business of Lehman Brothers, who have been employed for these purposes not infrequently by Section 409 (a) companies. The partners feel free to solicit this business for their firm.

". . . But we must consider the facts of the case in the light of the purpose of Congress to keep the developing aviation industry free of unhealthy interlocking relationships, though this purpose must be carried out only as the statute provides. The relevant findings which point up the problem are not in dispute. The underwriting activities of Lehman Brothers is a substantial part of its business; substantial fees are also obtained by Lehman Brothers from merger negotiations. Profits from the fees are shared by the partners. Section 409 (a) companies, with Lehman Brothers partners as directors, need and use both types of services, and the partner directors seek such business for the partnership. In doing so they act as representatives of the partnership. It follows that they act as representatives of fellow partners, some of whom are directors of air carriers. Is this representation within the meaning of the statute? Does Mr. Thomas, to use his case as illustrative, who is a Lehman Brothers partner and also a director of National Airlines, represent, as director of National Airlines, Mr. Lehman, another Lehman Brothers partner and director of Pan American? We think that the affirmative answer of the Board should not be disturbed. For the situation comes to more than some community of interest and some sharing of common benefits as partners. The particular common interest and benefits are among directors of the regulated industry with respect to industry matters. The partnership link does not extend merely to a type of business remote from the aeronautical industry in which the partners are directors; it is with respect to business activities of air carriers and other aeronautical companies enumerated in

Section 409 (a). In these activities there is not only literal representation by one partner of another in partnership business but the particular partnership business is as well the business of aeronautical enterprises of which the partners are directors. When Mr. Thomas, again to illustrate, as director of National seeks to guide that company's underwriting business to Lehman Brothers he acts in the interest of and for the benefit of Mr. Lehman who is not only his underwriting partner but is also a director of an air carrier, Pan American. Mr. Lehman the partner is the same Mr. Lehman the director. The Board is not required to separate him into two personalities, as it were, and to say that Mr. Thomas represents him as a partner but not as a director, if, as is the case here, the representation is in regard to the carrying on of the affairs of Section 409 (a) companies. The undoubted representation which grows out of the partnership we think follows into the directorships when the transactions engaged in are not only by the partners but concern companies regulated by the statute, of which the partners are directors. This is representation within not only the language but the meaning of the statute."