Ira L. **MENDELL**, on Behalf of VIACOM, INC. and, alternatively, Viacom International, Inc., Plaintiff,

v.

Keith R. **GOLLUST**, Paul R. Tierney, Jr., Augustus K. Oliver, Gollust, Tierney and Oliver, Gollust & Tierney, Inc., Coniston Partners, Coniston Institutional Investors, Baker Street Partners, WJB Associates, Helston Investment Inc., Viacom Inc., and Viacom International Inc., Defendants.

No. 87 Civ. 0085 (MBM).

United States District Court, S.D. New York.

May 18, 1992.

Irving Malchman, Kaufman, Malchman, Kaufmann & Kirby, New York City, for plaintiff.

Edwin B. Mishkin, David E. Brodsky, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants (other than Viacom Inc. and Viacom International Inc.).

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Ira L. Mendell sues on behalf of Viacom Inc. and alternatively Viacom International, Inc., to recover profits defendants allegedly realized by trading Viacom International stock in violation of § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Section 16(b) prohibits an owner of more than 10% of any class of an issuer's securities from purchasing and selling or selling and purchasing the issuer's securities within a six-month period. The central issue in dispute is whether defendants, who individually held less than 10% of Viacom International common stock but together held over 12%, should be con-sidered a single entity for the purposes of § 16(b). The case has been submitted for judgment on stipulated facts. For the reasons set forth below, judgment will be entered in favor of defendants.

### I.

Plaintiff filed this action in January 1987 when the common stock of Viacom International, Inc. ("Viacom International"), was registered pursuant to § 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and listed on the New York Stock Exchange. In June 1987, pursuant to a merger agreement, Viacom International's common stockholders exchanged their shares for a combination of cash and stock in a newly formed corporation, Viacom Inc., which became the sole owner of Viacom International. (Stip. ¶¶ 1, 2) Plaintiff as a shareholder of Viacom Inc. retained his standing to sue under § 16(b). *Gollust v. Mendell,* —— U.S. ——, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991).

The purchases and sales at issue were made in the summer and fall of 1986 by five of the defendants: Coniston Partners ("Coniston I"), Coniston Institutional Investors ("Coniston II"), Helston Investment Inc., Baker Street Partners, and WJB Associates (collectively "purchaser defendants"). The other defendants are natural persons—Keith R. Gollust, Paul R. Tierney, Jr., and Augustus K. Oliver—and entities they own—Gollust Tierney and Oliver ("GTO"), a New Jersey general partnership, and Gollust & Tierney, Inc., a New Jersey corporation (collectively "GTO defendants"). Although the transactions were executed by the purchaser defendants, the parties agree that the investment decisions were made by the GTO defendants as general partners of Coniston I, Coniston II, Baker Street and WJB, and as investment managers of Helston. (Stip. ¶ 11) Plaintiff argues that because the purchaser defendants were controlled by the GTO defendants and because the GTO defendants were entitled to share in the profits earned by the purchaser defendants, the holdings of the purchaser defendants should be aggregated and the GTO defen-

dants should be considered the beneficial owners of those shares. (Stip. ¶ 7)

A description of the transactions executed by each of the purchaser defendants, and the extent to which the GTO defendants shared in the profits realized on those transactions, is essential to an understanding of the case. Coniston I is a New Jersey limited partnership which, like the other purchaser defendants, was formed by the GTO defendants to trade in public securities. (Malchman Aff. ¶ 8; Stip. ¶ 10) The GTO defendants are the general partners of Coniston I and GTO is the managing partner. At the time of the Viacom International transactions, the GTO defendants were entitled to between 17.68% and 19.-72% of the profits of Coniston I by virtue of their capital investment in the partnership and, in addition, received a general partners' allocation of 20% of the balance of the partnership's profits. This amounted to a total interest of between 34.14% and 35.78%.[1] (Stip. ¶ 10(c)) The limited partners, primarily unaffiliated investors, were entitled to the remaining profits. Between July 17, 1986 and July 30, 1986, Coniston I purchased a total of 387,700 shares of Viacom International which represented a total of 1.13% of Viacom International's 34,336,-281 outstanding shares of common stock. (Stip. ¶ 5(a), 8(a))

The ownership structure of Coniston II, also a New Jersey limited partnership, is similar to that of Coniston I. GTO is the general partner and, at the time, was entitled to 21.26% of the total profits by reason of a 1.57% capital investment interest and a general partner's allocation of 20% of the balance of the profits.[2] (Stip. ¶ 10(d)) Between July 17, 1986 and September 15, 1986, Coniston II purchased 76,800 shares of Viacom International common stock and options on another 18,000 shares. Together, the shares and options represented 0.28% of Viacom International's outstanding common shares.[3] (Stip. 5(b))

Helston, a Panamanian corporation, is a wholly-owned subsidiary of Coniston International Corp., also a Panamanian corporation. At the time of the Viacom International transactions, Park Newent Associates, a partnership in which GTO had a 75% interest, owned 1% of the stock of Coniston International. The remaining 99% was owned by unaffiliated institutions and individuals. Because Park Newent was entitled to 20% of the profits represented by the ownership interests of the unaffiliated investors, in addition to the profits represented by its own shares, GTO was entitled to a total of 15.6% of the consolidated profits of Helston and Coniston International.[4] (Stip. ¶ 10(e)) Helston purchased 346,200 shares, 1.01% of Viacom International stock, between July 17, 1986 and August 25, 1986. (Stip. ¶ 5(c))

Baker Street, a New Jersey limited partnership, had one general partner, GTO, and two limited partners, Coniston I and Coniston II. Coniston I was entitled to 83.1% of Baker Street's profits and Coniston II was entitled to 16.9%. (Stip. ¶ 10(f)). Thus, the GTO defendants had a 33.33% stake in Baker Street's profits.[5] In late July and August 1986 Baker Street purchased 380,700 shares of Viacom International stock, which represented 1.11% of

---

1. The calculation where X equals the profit of Coniston I is as follows: $(.1768X) + (.20(X - .1768X))$ or $(.1972X) + (.20(X - .1972X))$. The resulting factor of X is the percentage of Coniston I profit to which the GTO defendants are entitled depending on which capital investment figure is assumed. Hereinafter, it will be assumed that the 19.72% figure is correct.

2. The calculation where X equals the profit of Coniston II is as follows: $(.0157X) + (.20(X - .0157X))$. The resulting factor of X is the percentage of profit to which GTO is entitled.

3. Options fall within the scope of § 16(b). *See* *Bershad v. McDonough,* 428 F.2d 693, 697–98

(7th Cir.1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

4. The calculation where X equals the consolidated profit of Helston and Coniston International is $X(.01)(.75) + (.20(X - .01X)).75$. The resulting factor of X is the percentage of profit to which GTO is entitled.

5. The calculation where X equals the profit of Baker Street is as follows: $.3578(.8310X) + .2126(.169X)$. The resulting factor of X is the percentage of profit to which the GTO defendants are entitled.

the outstanding common shares. (Stip. ¶ 5(d))

The purchaser defendant with the largest holding in Viacom International, 8.51%, was WJB, a Bahamian partnership. WJB purchased 2,538,500 shares in August and September 1986 and options on an additional 394,500 shares in September 1986. (Stip. ¶ 5(e); Stip. Ann. 1) Tracing the division of WJB's profits and determining the GTO defendants' interest in those profits requires navigation of a tortuous financial landscape. GTO was the general partner of WJB and there were six limited partners, Coniston I, Coniston II, Helston, Sabre Associates, Sabre Operations Inc. and Princeton/Newport Partners Special Situation Fund. Each of the limited partners was entitled to a percentage of WJB's profits in proportion to its respective capital contribution: Coniston I (54.47%); Coniston II (7.71%); Helston (31.41%); Sabre Associates (1.71%); Sabre Operations, Inc. (3.7%); and Princeton/Newport Partners Special Situation Fund (1%).

In addition to their interests in Coniston I, Coniston II and Helston which have already been discussed, the GTO defendants shared in the profits of WJB through Sabre Associates, Sabre Operations and Princeton/Newport Partners Special Situation Fund. Regarding Sabre Associates, GTO had a 58.82% limited partnership interest, a 5.18% indirect interest through its partial ownership of the managing general partner, and a 15% interest in the profits of other entities which held an aggregate interest of 34.26%. Thus, GTO was entitled to 69.15% of Sabre Associates' profits.[6]

Sabre Operations is a wholly-owned subsidiary of Sabre International Corp., 2% of which is owned by Sabre Newent Associates, a partnership in which GTO has a 50% interest. In addition to its 2% ownership interest, Sabre Newent was also entitled to 20% of the profits on shares owned by unaffiliated investors. Accordingly, GTO was entitled to 10.8% of the consolidated profits of Sabre Operations and Sabre International.[7]

The GTO defendants did not have an ownership interest in the Princeton/Newport Partners Special Situation Fund. However, the Fund's investment manager was Sabre Management Co., through which GTO was entitled to a fee of 10% of Fund profits.

Thus, after the profits flowed through all the WJB limited partners, the GTO defendants' total share in the profits of WJB Associates was 27.71%.[8]

At the time the purchaser defendants were buying Viacom International stock and options, Viacom International's management and National Amusements, Inc. ("NAI") were competing for control of Viacom International. (Malchman Aff. ¶ 9) On October 27, 1986, pursuant to an agreement reached on October 6, 1986, WJB sold NAI 2,687,000 shares of Viacom International at $43 per share. (Stip. ¶ 6) In addition, between October 7 and October 9, the other purchaser defendants sold a total of 830,000 shares on the open market at prices ranging from $43.4375 to $44.75 per share. (Stip.App.Ann. 2A at 27) All sales were made within six months of the purchaser defendants' initial acquisitions of Viacom International common stock.

## II.

Congress concluded that corporate insiders have access to valuable non-public information and that the probability that such information will be abused is intolerably high. In response to that perceived risk, Congress enacted a "flat rule" prohib-

---

**6.** The calculation where X equals the total profits of Sabre Associates is as follows: $.5882(X) + .0519(X) + .15(.3426X)$. The resulting factor of X is percentage of profit to which GTO is entitled.

**7.** The calculation where X equals the profit of Sabre Operations is as follows: $(.02X).5 + (.98X)(.20)(.5)$. The resulting factor of X is the percentage of profit to which GTO is entitled.

**8.** The calculation where X equals the profit of WJB is as follows: $.3578(.5447X) + .2126(.0771X) + .156(.3141X) + .6915(.0175X) + .108(.037X) + .1(.01X)$. The resulting factor of X is the percentage of profit to which GTO is entitled.

iting insiders from realizing profits on short term transactions. *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972); *see also Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591–95, 93 S.Ct. 1736, 1743–45, 36 L.Ed.2d 503 (1973). To "preven[t] the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer," § 16(b) of the Securities Exchange Act of 1934 permits "the issuer, or ... the owner of any security of the issuer", to bring suit in the issuer's name against any "beneficial owner, director, or officer" of the issuer to recover "any profit realized ... from any purchase and sale, or any sale and purchase, of any equity security of [the] issuer ... within any period of less than six months." 15 U.S.C. § 78p(b). The term "beneficial owner" is defined in § 16(a) as any person who directly or indirectly owns "more than 10 per centum of any class of" the issuer's securities. 15 U.S.C. § 78p(a).

■ Here, it is agreed that defendants were neither officers nor directors of Viacom International. (Stip. ¶ 4) It is uncontested also that no one of the defendants owned more than 10% of any class of Viacom International securities. (Stip. ¶ 7) Plaintiff contends, however, that because the GTO defendants controlled the purchaser defendants and shared in the profits, the GTO defendants should be considered the beneficial owners of the purchaser defendants' aggregate holdings. During the summer and fall of 1986, such holdings amounted to 12.04% of Viacom International's common stock;[9] thus, accepting plaintiff's argument would render the GTO defendants liable to Viacom Inc. for profits on the transactions.[10]

The purchaser defendants, however, were not wholly owned by the GTO defendants and, as discussed above, because of varying capital contributions and fee arrangements, the GTO defendants were entitled to only a percentage of the profits earned by each of the purchaser defendants. If beneficial ownership is limited by pro rata financial interest in the entity holding the shares, then the GTO defendants were the beneficial owners of 1,149,744 shares out of the 4,132,400 shares held by the purchaser defendants. Thus, the question arises whether the GTO defendants should be considered the beneficial owners of all shares held by the purchaser defendants, 12.04% of Viacom International, or only the number of shares represented by their financial stake in the holdings of the purchaser defendants, 3.35% of Viacom International.[11]

9. As discussed in the previous section, Coniston I owned 1.13%, Coniston II owned 0.28%, Helston owned 1.01%, Baker owned 1.11% and WJB owned 8.51%.

10. The extent of liability is in dispute. However, because judgment is entered for defendants, I need not reach the damages issue.

11.

| Entity | GTO Interest | Attributable Shares |
|---|---|---|
| Coniston I | 35.78% | 138,719 |
| Coniston II | 21.26% | 20,154 |
| Helston | 15.6% | 54,007 |
| Baker | | |
| Coniston I | 35.78% | 113,192 |
| Coniston II | 21.26% | 13,680 |
| WJB | | |
| Coniston I | 35.78% | 569,651 |
| Coniston II | 21.26% | 47,914 |
| Helston | 15.6% | 143,211 |
| Sabre Op. | 10.8% | 11,692 |
| Sabre As. | 69.15% | 34,603 |
| PNP | 10% | 2,921 |
| Total | | 1,149,744 |

% of Viacom Outstanding:
1,149,744/3,433,628 = 3.35%

In *Mayer v. Chesapeake Insurance Co.,* 877 F.2d 1154 (2d Cir.1989), *cert. denied,* 493 U.S. 1021 (1990), the Second Circuit considered an analogous situation. The Court held that although one of the defendants was chairman, president and chief executive officer of two public companies in which he owned a substantial amount of stock, that defendant was not a beneficial owner of the securities held by those companies or their subsidiaries. *Id.* at 1161–62; *see also Margolies v. Rea Bros. Plc.,* [1982–1983 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 99,261 at 96,178–79 (S.D.N.Y. June 30, 1983) (cited in *Mayer*). *Mayer* reserved the question of whether the outcome would have differed had the owner of the securities been a closely held corporation. 877 F.2d at 1161.

Although *Mayer* did not address directly the question presented here, its analysis helps decide this case. *Mayer* distinguished between two aspects of beneficial ownership—control over disposition of the securities and pecuniary interest in the securities. Judge Kearse, writing for herself and Judge Winter, over District Judge Sweet's dissent, concluded that despite defendant's control over disposition of the shares, his financial interest as a shareholder in the public companies which owned the shares was too insubstantial to amount to beneficial ownership. Judge Kearse reasoned that "[e]ven where an insider has complete control over a block of the stock of the registered company, if in fact he is not a beneficial owner in the traditional sense of the term and receives no direct pecuniary benefit from a profit in it, the profit is not received 'by him' and hence need not be disgorged pursuant to 16(b)." *Mayer,* 877 F.2d at 1160. Only in situations "[w]here the insider has ... control over the transactions and directly benefits from the profits, [is he] liable under § 16(b)." *Id.* at 1157. Plaintiff, pointing out that the GTO defendants had both control over and a pecuniary interest in the purchaser defendants' shares, argues that *Mayer* requires judgment in his favor. However, in so arguing, plaintiff incorrectly applies the "direct[ ] benefit[ ]" concept which the Second Circuit in *Mayer* held to

be the crucial component of beneficial ownership. *Id.*

The *Mayer* court concluded that some degree of control over the issuer's shares is necessary but not sufficient for a finding of beneficial ownership; rather, direct economic benefit is the critical factor in § 16(b) beneficial ownership analysis. The *Mayer* court contrasted § 16(b) with § 13(d), 15 U.S.C. § 78m(d), the Williams Act filing requirement for holders of more than 5% of a class of equity securities, noting that " '[§ 16(b)] stresses the economic benefit to be derived from the securities and [§ 13(d)] emphasizes the ability to control or influence the voting or disposition of the securities. As a result different determinations under [§§ 16(b) and 13(d)] are possible.' " *Mayer,* 877 F.2d at 1162 (quoting SEC Exchange Act Release No. 18114, 4 Fed.Sec.L.Rep. (CCH) ¶ 26,062 at 19,063–7 n. 17 (Sept. 23, 1981)). Judge Kearse also contrasted cases decided under § 13(d) such as *GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), which focused on control, with those decided under § 16(b) such as *Whittaker v. Whittaker Corp.,* 639 F.2d 516 (9th Cir.), *cert. denied* 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981) and *Whiting v. Dow Chemical Co.,* 523 F.2d 680 (2d Cir.1975), which focused on financial interest. *See Mayer* 877 F.2d at 1162.

In *Whittaker,* the defendant was granted an absolute power of attorney by his mother, a § 16(b) insider and, as a result, " 'exercised virtually complete control over his mother's affairs.' " 639 F.2d at 523 (quoting district court). Because the defendant freely used his mother's funds for his own purposes and benefitted from all her assets " '"exactly as if they were his own,' " (quoting district court), the *Whittaker* court concluded that profits on any trades made for the mother's account were realized by the defendant and that the defendant, therefore, was the beneficial owner of his mother's shares.

Similarly, in *Whiting, supra,* a director of Dow Chemical purchased Dow stock within six months of a sale of Dow stock

by his wife. The Second Circuit held that the husband's lack of *"exclusive"* control over the wife's stock was not dispositive in determining whether he was the beneficial owner of that stock. *Whiting*, 523 F.2d at 685 (emphasis in original). Instead, the issue turned on the finding that " 'beneficial owner[ship]' includes securities from which the spouse has shared 'benefits substantially equivalent to ownership.' " *Id.* at 686 (quoting SEC Exchange Act Release No. 7793, 4 Fed.Sec.L.Rep. (CCH) ¶ 26,031 at 19,057–4 (Jan. 19, 1966)). Because the profit realized on the wife's sale was enjoyed by the husband just as if he had executed the transaction, the husband was considered a beneficial owner of the wife's stock.

■ It is clear from *Mayer, Whittaker,* and *Whiting,* that control without direct financial interest does not constitute beneficial ownership, and that even without complete or exclusive control direct financial interest in the issuer's shares may itself constitute beneficial ownership. However, the question remains whether the GTO defendants, who controlled all the Viacom International shares held by the purchaser defendants and admittedly had a financial stake in a percentage of the profits earned on the Viacom International transactions, should be deemed beneficial owners of all the purchaser defendants' shares, or only of that fraction of the shares corresponding to their pro rata financial interest in the purchaser defendants' holdings.

In both *Whittaker* and *Whiting,* defendants benefited directly from all profits received in the short-swing transactions. By contrast, those cases which have considered whether indirect financial interest constitutes beneficial ownership, have held that a direct financial benefit is necessary to beneficial ownership. *See, e.g., Mayer,* 877 F.2d at 1161–62 (controlling shareholder's financial interest too remote). In *C.R.A. Realty Corp. v. Goodyear Tire & Rubber Co.,* 705 F.Supp. 972, 977 (S.D.N.Y.), *aff'd mem.,* 888 F.2d 125 (2d Cir.1989), Judge Lasker wrote that "existing case law supports the proposition that shares owned by different persons may not be aggregated to create a 10 per cent per-

son absent an allegation that one person received direct pecuniary benefit from another's shares." *See also Rothenberg v. Jacobs,* [1988–1989 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 94,199, 1989 WL 47442 (S.D.N.Y. Jan. 11, 1989) ("Pecuniary benefit, rather than control over the securities is the determining factor of beneficial ownership ... the language of 16(b) imposes liability for profits personally realized.") In *C.B.I. Industries Inc. v. Horton,* 682 F.2d 643 (7th Cir.1982), Judge Posner wrote for a panel of the Seventh Circuit held that a trustee with unrestricted control of the trust *res* did not realize the profits earned by the trust through short-swing transactions. He reasoned that "profit realized by a corporate insider means direct pecuniary benefit to the insider as in the factual settings of *Whiting* and *Whittaker.*" *Id.* at 646.

Admittedly, no one of the above cited cases addressed the situation presented here—where defendants controlled over 10% of the issuer's shares but had a direct ownership stake in less than 10% of the issuer's shares—but, in each of those cases beneficial ownership and liability were limited to those defendants who received a direct pecuniary benefit from the shares bought and sold. If beneficial ownership, and resulting liability, is determined based on direct financial benefit, it follows that if a person owns a percentage interest in a pool of the issuer's shares that person should be considered the beneficial owner of only that fraction of the issuer's shares that corresponds to his pro rata financial interest in the pool's profits.

Limiting beneficial ownership in this manner is consistent with how the SEC treated beneficial ownership at the time the Viacom International trades were made. In a release interpreting § 16(a) which has broader coverage than § 16(b), *Mayer,* 877 F.2d at 1159; SEC Exchange Act Release No. 7824, 4 Fed.Sec.L.Rep. (CCH) ¶ 26,030 (Feb. 14, 1966), the SEC explained the rule regarding holdings of a general partnership as follows:

*Question:* Must a member of a partnership take into account the entire hold-

ings of the partnership in determining whether he is a 10 percent beneficial owner of a class of equity security of a registered company?

*Answer:* No. A partner is required to include only his own economic interest in the partnership holdings. Thus only his pro rata interest in the securities held by the partnership must be added to his own personal beneficial interest.

\*    \*    \*    \*    \*    \*

*Illustration:* Three individuals form a general partnership in which each has an equal interest. The partnership holds 29 percent of a class of registered equity security. The partners do not hold any other securities of that class.

*Interpretation:* Since each partner's pro rata interest in the securities is less than 10 percent of the class, the individual partners are not subject to § 16(a).

SEC Exchange Act Release No. 18114, 4 Fed.Sec.L.Rep. (CCH) ¶ 26,062 at 19,063–8 (Sept. 23, 1981).[12]

Moreover, the Supreme Court consistently has declined to extend the scope of § 16(b) beyond what is clearly required by the language of the statute. In a ruling rendered in this case on the issue of whether plaintiff had standing to sue, the Court stated:

> Because the statute imposes 'liability without fault, within its narrowly drawn limits,' we have been reluctant to exceed a literal, 'mechanical' application of the statutory text in determining who may be subject to liability, even though in some cases a broader view of statutory liability could work to eliminate an 'evil that Congress sought to correct through § 16(b).'

*Gollust,* 111 S.Ct. at 2178 (citations omitted). In fact, the Supreme Court has declined frequent opportunities to broaden § 16(b) liability. *See Foremost–McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) (to be held

liable shareholder must have 10% stake prior to purchase or sale in question); *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) (shareholder not liable for shares acquired pursuant to defensive merger); *Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) (for § 16(b) liability insider must be a 10% shareholder at the time of the terminal transaction). In the case most closely analogous to the one at hand, *Blau v. Lehman,* 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), defendant, a brokerage firm, realized a short-swing profit while one of its partners was a director of the issuer. The Court held that although the director was liable for his pro rata share of the partnership's profit, the partnership need not disgorge the remaining profit. The Court acknowledged that its holding may have " 'substantially eliminat[ed] the great Wall Street trading firms from the statute's operation,' " *Id.* at 411, 82 S.Ct. at 455 (quoting Court of Appeals), but it nevertheless refused to extend the scope of § 16(b).

For the purposes of this case, *Blau* is instructive in three respects. First, § 16(b) was narrowly construed although a broader construction would have furthered the goal of curbing insider trading. Second, the Court noted that the legislative history supported a narrow construction. *Id.; see also* Note, *Beneficial Ownership Under Section 16(b) of the Securities Exchange Act of 1934,* 77 Colum.L.Rev. 446, 452 (1977). Finally, in its analysis the *Blau* Court segregated those profits earned directly by the insider from those profits attributable to the insider but which inured to the economic benefit of others.

Similarly here, I believe it is proper to include only those shares from which the GTO defendants were entitled to a direct financial benefit when calculating the extent of their holdings in Viacom International. It follows that although the pur-

---

**12.** The SEC has since adopted a new approach to the holdings of limited partnerships. *See* 17 C.F.R. § 240.16a–1; *see also* SEC Exchange Act Release No. 28,869 [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,709 at 81,252–55 (Feb. 13, 1991). The parties agree, however, that the new rules do not apply to the transactions at issue. (*See* Pltf.Reply Mem. at 5; Def. Mem. at 11 n. 6.)

chaser defendants held shares amounting to a 12.04% stake in Viacom International, the GTO defendants were the beneficial owners of only 3.35% of Viacom International's outstanding common stock. Because § 16(b) imposes no liability unless the GTO defendants' holdings exceeded 10%, judgment will be entered for defendants.

SO ORDERED.