**CBI INDUSTRIES, INC.,**
**Plaintiff-Appellee,**

v.

**John T. HORTON, Defendant-Appellant.**

**No. 82–1262.**

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1982.

Decided June 25, 1982.

Calvin Sawyier, Winston & Strawn, Chicago, Ill., for defendant-appellant.

Michael M. Conway, Hopkins & Sutter, Chicago, Ill., for plaintiff-appellee.

Before WOOD and POSNER, Circuit Judges, and FOREMAN,* Chief Judge.

POSNER, Circuit Judge.

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), provides, so far as is immediately relevant here, that if a corporate director sells shares in his company and then, within six months, buys shares in the company, "any profit realized by him" shall be recoverable in a suit by the

* Of the Southern District of Illinois.

company. Thus, if a director sold 1000 shares in his company for $60 a share and within six months bought 1000 shares for $40, the company could sue him for $20,000, his "profit" on the transaction (more realistically, the loss he averted by selling when he did). We have to decide in this case whether the "him" includes his grown children, when they are beneficiaries of a trust of which the director is a co-trustee.

Horton, the defendant in this case, is a director of CBI Industries, Inc., the plaintiff. Along with the Continental Illinois National Bank and Trust Company of Chicago he is co-trustee of a trust (actually two trusts, but to make this opinion simpler we shall treat them as one) created many years ago by his mother for the benefit of his two sons. In the period relevant to this case they were full-time students, 19 and 22 years old, living apart from Horton most of the time. The original assets of the trust consisted entirely of CBI stock. The trustees were authorized but not required to retain the stock, and the record does not reveal the present composition of the trust's assets. In 1980 Horton sold on the open market 3000 shares of CBI stock that he owned himself; and within six months he bought (again on the open market), this time for the trust, 2000 shares of the stock at a lower price than he had sold his own stock. The difference in price, multiplied by 2000, is $25,000—the amount CBI sued Horton for, and recovered below. 530 F.Supp. 784 (N.D.Ill.1982).

If Horton had bought the shares for his own account he would indisputably have violated section 16(b) and the company would have been entitled to his $25,000 "profit." But that is because the $25,000 would have been his to do with as he liked; it would have been "profit realized by him," in the language of the statute. The $25,000 that the trust may be said to have gained from the purchase of the shares at a price lower than the price at which Horton had earlier sold his own shares (gained, that is, by waiting to buy until the price fell) did

not become his to use as he wished, but was for the exclusive use of his sons. It is true that as the family-member co-trustee, Horton had, within very broad limits, the power to manage the trust; for when a bank is a co-trustee with a member of the family of the grantor and the beneficiaries, it ordinarily defers to the family member's wishes, and did so here. But Horton did not have the power to divert the income of the trust to himself. That would clearly have violated the terms of the trust, and even a somnolent bank trustee would have been jarred awake by an attempt at such a diversion. Moreover, since the trust beneficiaries were, in contemplation of law at least, adults, see, e.g., *Waldron v. Waldron*, 13 Ill.App.3d 964, 301 N.E.2d 167 (1973), Horton could not have looked to the income of the trust to fulfill his legal obligation of support, thereby replacing personal income that he would otherwise have had to devote to the boys—he no longer had any such obligation. (In any event, if he had used trust income to fulfill a legal obligation, the income so used would have been taxed to him rather than to the trust, a result that he would almost certainly want to avoid and that therefore was unlikely to occur, and so far as appears did not occur.) Finally, it is of little significance that Horton is the first in a series of contingent remaindermen of the trust. If both boys die without issue before they reach the age of 25, all of the assets of the trust will go to him. The probability of this happening could be calculated, and the result of this calculation could be multiplied by $25,000 to yield the expected value to Horton of the trust's profit from the challenged transaction, but no one has made this calculation and we suspect it would yield a number too minute to motivate CBI to sue.

If Horton did have a pecuniary interest in the trust's $25,000 "profit," the fact that the stock was not purchased in his name would not be decisive. In *Whiting v. Dow Chem. Co.*, 523 F.2d 680, 682 (2d Cir. 1975), the wife of a corporate director sold stock in his company less than six months before he bought shares in it at a lower price, and the difference in price was held to be a

profit realized by him. But her income was considerably larger than his and was used to pay many of their joint living expenses, so that in effect the defendant was treating her money, including proceeds from transactions in the stock of the company of which he was a director, as if it were his. But so far as appears Horton does not—and under the terms of the trust he may not—treat the trust income this way. In *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 523 (9th Cir. 1981), the defendant's mother had given him a general power of attorney which he used, among other things, " 'to freely borrow large sums of money from her while never having to consider paying the money back, posting adequate security or even paying any interest that might accrue.' " In fact, he "felt free to utilize his mother's assets exactly as if they were his own." He thus had a direct pecuniary stake in the profits from the insider trading that he did in her name. (To similar effect see *Jefferson Lake Sulphur Co. v. Walet*, 104 F.Supp. 20, 25 (E.D.La.1952), aff'd, 202 F.2d 433 (5th Cir. 1953).) If Horton had like access to the trust assets, or if, as in *Whiting*, those assets were used to pay his living expenses, then a profit realized by the trust would be realized "by him" within the meaning of the statute; otherwise the statute would be so easily avoidable as to be virtually a dead letter.

But we cannot stop here. Having regard for the purpose and not merely the language of section 16(b), we must consider whether the words "profit realized by him" should be read more broadly—as broadly as the temptations that led Congress to enact the statute in the first place can be conceived. The preamble to section 16(b) describes the statutory purpose as "preventing the unfair use of information which may have been obtained" by the classes of corporate insiders specified in section 16(a). This suggests, what is anyway obvious, that the framers were concerned that corporate insiders would be tempted to use inside information to make short-term speculative profits; and the temptation is there whether the beneficiary is the insider himself or

his children, grown or otherwise. A person's "wealth," in a realistic though not pecuniary sense, is increased by increasing the pecuniary wealth of his children—even if no part of their increased wealth is used to reduce any legal obligation of support that he may owe them, even if they never spend a nickel on him, even if he has no financial relations with them at all—provided only that he has the normal human feelings toward his children. To limit "profit realized by him" to purely pecuniary receipts thus seems, in the case of Mr. Horton, to ignore human nature.

But taking a "realistic" approach to the interpretation of these words would result in placing greater restrictions on corporate insiders than Congress can plausibly be thought to have intended in 1934, when notions of conflict of interest were less exacting than they are today. We asked CBI's counsel at oral argument whether in his view it would have made any difference to Horton's liability if the trust beneficiaries had been Horton's godsons rather than his sons. Counsel said it would not, but that it would be a different matter if the beneficiary were Horton's alma mater. But some men love their colleges as much as their godsons. An argument that the district court found persuasive (see 530 F.Supp. at 787 and n.2)—that an increase in the income of the trust would save Horton money by reducing the "voluntary gifts" he would "need" to make to his children—would apply with equal force if the beneficiary of the trust had been Horton's alma mater.

Thus the implication of holding Horton liable in this case would be that neither he nor any corporate insider could manage or control (or, we suppose, influence, see *Whiting, supra*, 523 F.2d at 688–89) an investment portfolio containing the stock of his company without being in jeopardy of violating section 16(b). *Blau v. Lehman*, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), where the Supreme Court refused to treat a profit realized by the defendant's partnership as profit realized by him, is authority against going so far; and even if we could distinguish *Blau*, we would not feel free to impute the morality of the 1980s to the Congress of the 1930s.

It would moreover be arbitrary to take CBI's suggestion and use as a cut-off point the definition of beneficial owner in Rule 16a–8 of the Securities and Exchange Commission. Section 16(a) of the Act defines as one type of corporate insider subject to the statute anyone who is "directly or indirectly the beneficial owner" of more than 10 percent of any class of any registered equity security, and the rule defines a beneficial owner for purposes of section 16(a) as including a trustee of a trust for a member of the trustee's "immediate family," defined in turn as including a child of any age. 17 C.F.R. § 240.16a–8(e)(1). But the purpose of this definition is unrelated to the issue in the present case. It is to figure out who has a large enough stake in the corporation to be deemed an insider. For this purpose the adding up of family interests is eminently reasonable. But Horton is not an insider by virtue of being a beneficial owner, directly or indirectly, of more than 10 percent of the stock of CBI, but by virtue of being a director. Rule 16a–8 is irrelevant.

We hold that profit realized by a corporate insider means direct pecuniary benefit to the insider, as in the factual settings of *Whiting* and *Whittaker*; it is not enough that ties of affinity or consanguinity between the nominal recipient and the insider make it likely that the insider will experience an enhanced sense of well-being as a result of the receipt, or will be led to reduce his gift-giving to the recipient. See *Marquette Cement Mfg. Co. v. Andreas*, 239 F.Supp. 962, 967 (S.D.N.Y.1965); 2 Loss, Securities Regulation 1043 (1961); see generally Note, *"Beneficial Ownership" Under Section 16(b) of the Securities Exchange Act of 1934*, 77 Colum.L.Rev. 446 (1977). The test of "some direct or indirect benefit" in *Altamil Corp. v. Pryor*, 405 F.Supp. 1222, 1227 (S.D.Ind.1975), relied on by the district court in this case, is therefore disapproved, though we express no view on how that case should have been decided under the standard we adopt today.

To prevail in this case, CBI therefore would have to show that the trust was a sham; that despite its terms Horton was able to use income or assets of the trust to pay his personal expenses. CBI has made no effort to prove a direct pecuniary benefit to Horton. But we shall leave it to the district judge to decide, in the first instance at least, whether it should be given a chance to try to prove liability under the standard adopted in this opinion.

■ Strictly speaking, we need not resolve Horton's alternative contention that even if he derived sufficient benefit indirectly from the $25,000 profit made by the trust to have violated section 16(b), he should not be held liable for the entire profit; his reasoning is that the benefit to him must have been a lesser amount since there is no contention that he could divert the whole $25,000 to his own use. But as this issue could become important in the event that CBI wants, and the district judge grants it, an opportunity to try to establish liability under the standard of direct pecuniary benefit that we adopt today, we shall discuss it briefly. The standard of direct pecuniary benefit excludes by definition any attempt to monetize the emotional satisfaction that Horton might derive from a transaction that increased the wealth of his sons. But it does not exclude an attempt to measure any direct pecuniary benefit that he may have received from the transaction even if that benefit was less than $25,000. It does not even exclude the possibility of computing the actuarial value of the increase in his contingent remainder due to the profit to the trust—for an expected value is a form of direct pecuniary benefit.

We thus reject the view that the profit nominally received by a third party must be attributed to the insider either entirely or not at all. In *Pappas v. Moss*, 257 F.Supp. 345, 367 (D.N.J.1966), where the insiders were beneficiaries of a trust they controlled, the court multiplied the profit realized by the trust by the percentages representing the insiders' proportional interests in it to determine the amount that the

company could recover from them in its section 16(b) action. This is the correct approach; and it brings out an important practical reason for our adopting the standard of direct pecuniary benefit. If Horton were held liable in this suit on the theory that he benefits, albeit indirectly or intangibly, from anything that makes his sons wealthier, it still would be arbitrary to assume that he benefits to the tune of the full dollar increment in their wealth—$25,000. *Blau v. Lehman, supra*, 368 U.S. at 414, 82 S.Ct. at 457, rejected the imputed-profit approach when it stated, "It would be nothing but a fiction to say that Thomas [the insider] 'realized' all the profits earned by the partnership of which he was a member. It was not error to refuse to hold Thomas liable for profits he did not make." It would therefore be necessary even under an indirect-benefit approach to calculate how much of the profit to the trust was actually realized by Horton. Though some economists believe that emotional relationships within the family can be expressed in economic terms and, presumably, monetized, see, e.g., Becker, A Treatise on the Family, ch. 8 (1981), we doubt that the framers of section 16(b) would have wanted to complicate enforcement of the statute to this degree merely to make an already Draconian strict liability statute still more Draconian. It would be only a little simpler to determine the effect of the trust's profit on Horton's gift-giving to his sons. Neither determination was attempted below; neither would be proper under the approach we adopt today.

The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

WOOD, Circuit Judge, dissenting in part.

It is for me a very close question, but I prefer the approach labeled and rejected by the majority as "realistic" even though it does have some shortcomings. Section 16(a) defines a beneficial owner as including a trustee of a trust for members of the "immediate family." That, of course, ap-

plies to a different aspect of the insider problem, but I view it as at least a sparse clue as to what 16(b) may mean. I prefer to read 16(b) a little more broadly so as to include "immediate family" in its proscriptions. Therefore, I respectfully dissent on that issue, but I concur in the majority's analysis of the pecuniary benefit issue.