877 F.2d 1154
 Fed. Sec. L. Rep. P 94,504
Mary MAYER, Plaintiff-Appellant,
v.
CHESAPEAKE INSURANCE COMPANY LIMITED, DWG Corporation, NVF
Company, National Propane Corporation, APL Corporation,
Chesapeake Financial Corporation, Southeastern Public
Service Company, Victor Posner, Peabody International
Corporation, The Pullman Company, and PTC Acquisition, Inc.,
Defendants-Appellees.
 No. 791, Docket 88-7905.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 8, 1989.
Decided June 26, 1989.
 
 Richard M. Meyer, New York City (Wendy K. Goidel, Milberg Weiss Bershad Specthrie & Lerach, New York City, on the brief), for plaintiff-appellant.
 Colleen McMahon, New York City (Orin S. Snyder, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for defendants-appellees.
 Before KEARSE and WINTER, Circuit Judges, and SWEET, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Mary Mayer appeals from a final judgment entered in the United States District Court for the Southern District of New York following a bench trial before John F. Keenan, Judge, awarding $4,858.50, plus interest, against defendant APL Corporation ("APL"), on her claim that APL and the other defendants controlled by defendant Victor Posner (collectively the "Posner companies") had obtained short-swing profits in the common stock of Peabody International Corporation ("Peabody"), in violation of Sec. 16(b) of the Securities Exchange Act of 1934 ("Exchange Act" or "1934 Act"), 15 U.S.C. Sec. 78p(b) (1982), and dismissing the complaint against Posner and his other companies. On appeal, Mayer contends that the district court erred in finding that Posner and the Posner companies other than APL were not beneficial owners of APL's Peabody stock for purposes of Sec. 16(b), and in failing to include in the sales price of that stock the entire amount of a settlement paid to Posner companies by Peabody and The Pullman Company ("Pullman"). For the reasons below, we affirm the judgment.
 
 I. BACKGROUND
 
 2
 The historical facts are not in dispute. The pertinent events, as found by the trial court or stipulated by the parties, were as follows.
 
 A. The Parties and the Events
 
 3
 The defendant Posner companies are Chesapeake Insurance Company Limited ("Chesapeake Insurance"), DWG Corporation ("DWG"), NVF Company ("NVF"), National Propane Corporation ("Propane"), Chesapeake Financial Corporation ("Chesapeake Financial"), Southeastern Public Service Company ("Southeastern"), and APL. Posner and his family entities owned or controlled 16.8% of the common stock of DWG, which in turn owned 100% of Propane and 63.6% of Southeastern; Southeastern owned 48% of the common stock of Chesapeake Financial; Chesapeake Financial owned 100% of Chesapeake Insurance. Posner and his family entities also owned or controlled between 35% and 38% of the common stock of NVF, which in turn owned 56.7% of APL. NVF and Propane owned a total of some 24% of Chesapeake Financial; the remaining 28% of Chesapeake Financial was owned by subsidiaries of NVF. DWG, Southeastern, NVF, and APL were publicly traded companies, each listed on one or more stock exchanges. Posner was the chairman, president, and chief executive officer of all seven of these corporations.
 
 
 4
 Prior to November 1983, DWG, Chesapeake Insurance, and Propane became holders of common stock of Peabody, a corporation registered on the New York Stock Exchange. Chesapeake Insurance purchased a total of 2,305,800 shares between May 4, 1981, and November 7, 1983; DWG purchased 20,900 shares on June 24, 1983; and Propane purchased a total of 266,300 shares between July 12, 1983, and September 19, 1983. Between November 1983 and April 1984, Peabody and Chesapeake Insurance engaged in negotiations looking toward a merger.
 
 
 5
 After the negotiations ended unsuccessfully, Peabody made a tender offer for 2.3 million shares of its own stock; this offer was withdrawn after Chesapeake Insurance, DWG, and Propane brought a derivative suit in a Florida state court seeking to enjoin the offer. On June 19, 1985, Peabody signed a defensive merger agreement with Pullman and granted Pullman an option to purchase more than 2 million shares of Peabody stock if, inter alia, any group of stockholders holding 20% or more of Peabody's stock increased its holdings by 5% or more. The option effectively gave Pullman the power to block any competing merger proposal.
 
 
 6
 Just prior to August 7, 1985, Chesapeake Insurance, DWG, and Propane owned a total of about 23% of Peabody common stock, consisting entirely of the shares they had purchased prior to November 8, 1983. APL owned no shares of Peabody prior to August 7, 1985. Between August 7 and September 19, 1985, APL purchased some 1,421,800 shares of Peabody stock at prices ranging from $10 to $11 per share. As of August 23, 1985, APL was the record owner of more than 10% of Peabody's common stock; it purchased an additional 290,100 shares between that date and September 19, 1985.
 
 
 7
 Each of the Posner companies that owned Peabody stock filed statements with the Securities and Exchange Commission ("SEC" or "Commission") pursuant to Sec. 13(d) of the Exchange Act, 15 U.S.C. Sec. 78m(d) (1982 & Supp. V 1987), and SEC Rule 13d-5, 17 C.F.R. Sec. 240.13d-5 (1988) ("13D Schedules"). The 13D Schedules stated that "[t]he reporting persons named [therein] may be deemed to be controlled directly or indirectly by Victor Posner." DWG acknowledged its control of the Peabody shares owned by its wholly owned subsidiary Propane; in all other respects, each Posner company disclaimed beneficial ownership of the Peabody shares owned by any other Posner company.
 
 
 8
 During the summer of 1985, Peabody and Pullman met with Posner several times, seeking to persuade him not to oppose their proposed merger. In one July meeting, Pullman offered to pay $2 million for a standstill agreement whereby Chesapeake Insurance, DWG, and Propane would refrain from increasing their 23% interest in Peabody and would not oppose the merger. At the next meeting, Pullman increased this offer to $4 million. There was no contemplation that Chesapeake Insurance, DWG, and Propane would sell their Peabody stock as part of this agreement; rather, they were urged to vote that stock in favor of the merger. Posner rejected these offers and refused to support the merger.
 
 
 9
 On August 21, 1985, Peabody commenced a suit in federal court in Connecticut against Chesapeake Insurance, DWG, Propane, APL (collectively the "Posner Group"), and Posner, alleging that they had violated Secs. 10(b) and 13(d) of the 1934 Act by filing false 13D Schedules and had manipulated the market by failing to disclose an intention to take over Peabody. Those defendants filed counterclaims and indicated their intention to challenge the option granted to Pullman, as well as Peabody's subsequent issuance to Pullman in August 1985 of 1.5 million shares of preferred stock.
 
 
 10
 On September 20, 1985, all of these disputes were resolved. Peabody, Posner, and the Posner companies other than NVF entered into a settlement agreement under which, inter alia, the pending suits in Connecticut and Florida were discontinued, in exchange for a payment of $5.6 million from Peabody and Pullman to the Posner Group. Of this sum, $600,000 was paid to the defendants' counsel, and $5 million was distributed as follows: $1,770,000 to APL, $2,870,000 to Chesapeake Insurance, $330,000 to Propane, and $30,000 to DWG. The settlement agreement included standstill provisions in which Posner and his companies agreed to refrain for five years from, inter alia, (1) purchasing Peabody or Pullman stock, (2) taking actions that would lead to their control of Peabody or Pullman, and (3) interfering with the Peabody-Pullman merger. On the day the settlement agreement was executed, Chesapeake Insurance, DWG, Propane, and APL sold their holdings of Peabody stock, through investment bankers, to unidentified institutional investors at a net price of $10.375 per share.
 
 B. The Present Suit
 
 11
 Mayer commenced the present action as a stockholder of Peabody, seeking to recover on its behalf short-swing profits under Sec. 16(b) of the 1934 Act. She contended that because of the relationship between APL and the other members of the Posner Group, APL should be considered to have been a 10% owner of Peabody stock prior to August 7, 1985, and that APL's purchases in August and September 1985 and sales in September 1985 thus resulted in short-swing profits on all 1,421,800 of its shares. She also contended that all of the $5.6 million settlement amount was paid to the Posner Group as a result of the APL stock purchases and thus should be considered part of the sales price of APL's Peabody stock.
 
 
 12
 In an opinion published at 698 F.Supp. 52 (1988), the trial judge largely rejected Mayer's contentions. He found that each member of the Posner Group received proceeds from the sale of shares in proportion to its ownership of shares; that Posner himself did not receive any direct benefit from the sale of the shares; and that none of Posner's corporations received any financial benefit from the sale of shares it did not own. The district judge concluded that each Posner company's interest and profit should thus be considered individually. He ruled that only the 290,100 shares bought by APL after it became a 10% owner of Peabody common stock were within the purview of Sec. 16(b) and that hence only profits from the sale of those shares should be disgorged.
 
 
 13
 The court also found that only $1 million of the $5.6 million paid to the Posner Group by Peabody and Pullman represented payment for the sale of stock. The court found that the settlement agreement, which (a) eliminated substantial opposition to the proposed merger, (b) terminated two lawsuits, and (c) ensured that Posner companies would not seek to take over Peabody or Pullman for five years, was not worthless. In light of the summer offer by Pullman of $4 million for a standstill agreement that would not have required any Posner companies to sell their Peabody stock, the court found that the value of the settlement agreement was $4 million. Deducting that $4 million plus the $600,000 for attorneys' fees from the $5.6 million payment, the court found that $1 million should be regarded as consideration for the sale of the Peabody shares.
 
 
 14
 After (a) calculating APL's share of the $1 million and the percentage of that share that was attributable to the stock purchased after APL became a 10% owner, (b) adding the resulting sum to the amount APL received from the institutional investors who purchased the shares, and (c) subtracting what APL had paid for the shares, the court found that APL's profit on the 290,100 shares subject to Sec. 16(b) was $4,858.50. Judgment was entered against APL in the amount of $5,980.80, which included prejudgment interest.
 
 
 15
 The claims against Posner and the other Posner companies were dismissed. This appeal followed.
 
 II. DISCUSSION
 
 16
 On appeal, Mayer contends principally that the district court erred (1) in not regarding Posner and each of his companies as joint beneficial owners, within the meaning of Sec. 16(b), of the Peabody stock owned by each member of the Posner Group, and (2) in not regarding the entire $5.6 million payment to the Posner Group as payment for APL's Peabody stock. We reject both contentions.
 
 A. Sec. 16(b) Liability
 
 17
 Section 16(b) of the Exchange Act provides, in pertinent part, as follows:
 
 
 18
 For the purpose of preventing the unfair use of information which may have been obtained by [the] beneficial owner [of more than 10 per centum of any class of the equity securities of a company registered on a national stock exchange], director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer....
 
 
 19
 15 U.S.C. Sec. 78p(b); see Exchange Act Sec. 16(a), 15 U.S.C. Sec. 78p(a) (1982). Thus, with respect to companies such as Peabody, Sec. 16(b) provides that a 10% owner, director, or officer (collectively "insiders") can be required to disgorge to the company any profit made by him on any purchase and sale of the company's securities within a six-month period. See, e.g., Feder v. Martin Marietta Corp., 406 F.2d 260, 262, 268-69 (2d Cir.1969), cert. denied, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970). Since this provision for forfeiture of short-swing profits applies only to insiders, the appropriate inquiries with respect to Sec. 16(b) liability in the present case were (1) whether APL, which profited from short-swing transactions, was an insider, and (2) as to any other person who was an insider, whether the profit on the APL transactions was realized "by him." The district court answered the first question partly in the negative, and answered the second question entirely in the negative. For the reasons below, we find no errors in these answers.
 
 
 20
 A company may be the beneficial owner of stock in a variety of ways, including through its absolute control over a subsidiary that owns the stock. See Blau v. Mission Corp., 212 F.2d 77, 80 (2d Cir.) ("Mission "), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954). In Mission, the parent corporation ("Mission") purchased more than 10% of the stock in Tide Water Associated Oil Company ("Tide Water") and formed a wholly owned subsidiary ("Development") to which it transferred the Tide Water stock. Within six months, Mission began purchasing additional shares of Tide Water in the market; it continued these purchases for some two years and eventually transferred more Tide Water shares to Development. In the meantime, Mission distributed part of its Development stock to Mission stockholders as dividends but retained "60 per cent of Development and hence obviously did not relinquish actual control of the Tide Water block of stock." Id. The ultimate question was whether either transfer of Tide Water shares to Development constituted a sale within the meaning of Sec. 16(b). As to the preliminary question of whether Mission was a beneficial owner of the Tide Water stock and hence was an insider to which Sec. 16(b) applied, we concluded as follows:
 
 
 21
 There can be no doubt that Mission, by virtue of its absolute control of Development, was indirectly the owner of all Tide Water stock held by Development and was therefore an insider throughout the period in issue.
 
 
 22
 Mission, 212 F.2d at 80; see id. at 80-81 (second transfer, but not first, held to be a Sec. 16(b) sale). Cf. Blau v. Lamb, 363 F.2d 507, 526 (2d Cir.1966) (individual who owned 97% of one corporation and 100% of another is deemed owner of the stock held by either, and hence sale of stock by one corporation to the other was not a Sec. 16(b) transaction since individual remained the owner), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).
 
 
 23
 Consistent with these rulings, the SEC has adopted the position that, for purposes of the reporting requirement under Sec. 16(a) of the 1934 Act, which is somewhat broader than the Sec. 16(b) requirement that short-swing profits be disgorged, see Whiting v. Dow Chemical Co., 523 F.2d 680, 685 n. 8, 687 (2d Cir.1975); SEC Exchange Act Release No. 7824, 4 Fed.Sec.L.Rep. (CCH) p 26,030 (Feb. 14, 1966), a person in control of a closely held company is deemed to be the beneficial owner of all securities held by that company, reasoning that in such circumstances "all of the indicia of beneficial ownership are present." SEC Exchange Act Release No. 18114, 4 Fed.Sec.L.Rep. (CCH) p 26,062, at 19,063-8 (Sept. 23, 1981) ("Rel. No. 18114"). In contrast, the Commission has suggested that a shareholder of a publicly held corporation is not deemed a beneficial owner of securities held by that corporation. "Normally, an insider who is a shareholder of a publicly held company would not be obligated to report his interest in that company's transactions in the registered security, since he would not usually be considered to be, even indirectly, the beneficial owner of that security." Id.; see also SEC Exchange Act Release No. 26333, [1988-1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 84,343, at 89,604 n. 70 (Dec. 2, 1988) ("Rel. No. 26333") ("holdings generally have not been attributed to the individual shareholders of a corporate shareholder, except in situations involving closely held corporations").
 
 
 24
 In Mission, the beneficial ownership question was explored in order to determine whether the defendant was an insider within the meaning of Sec. 16(b), i.e., whether he was the beneficial owner of more than 10% of the registered company's stock. In a number of other cases, the courts have explored the concept of beneficial ownership as it pertained to a person who was a director or officer of the registered company, i.e., an insider to whom Sec. 16(b) applied regardless of the size of his stock holding. See CBI Industries, Inc. v. Horton, 682 F.2d 643, 646 (7th Cir.1982); Whittaker v. Whittaker Corp., 639 F.2d 516, 523-27 (9th Cir.), cert. denied, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981); Whiting v. Dow Chemical Co., 523 F.2d at 685-89. In these cases, the key question was whether the profit was made, as required for a disgorgement under Sec. 16(b), "by" the insider. The answer turned on whether or not the insider obtained a direct pecuniary benefit from the profit.
 
 
 25
 Where the insider has absolute control over the transactions and directly benefits from the profits, he is liable under Sec. 16(b). In Whittaker, the president and chairman of the registered company had a power of attorney from his ailing mother who was a substantial holder of the company's stock. He " 'exercised virtually complete control over his mother's affairs,' " 639 F.2d at 523 (quoting district court's findings), having sole discretion over transactions for her account, including the ability to borrow large sums of money from her to finance his own investments without having to consider paying the money back, posting security, or paying interest. The Whittaker court, noting that this insider exercised absolute control over the securities and had the unfettered ability to use the profits made from transactions in them, and that it was " 'obvious that Mr. Whittaker stood to gain on any profits he might make for his mother through the purchase and sale of Whittaker Corporation securities,' " id. (quoting district court's findings), concluded that profits inuring to the account of the mother were made "by" him.
 
 
 26
 Even where the insider's control is not absolute, he may be held liable under Sec. 16(b) if he directly benefits from the transactions. In Whiting v. Dow Chemical Co., we held that a director of a registered company, who purchased stock in the company within six months after the sale of stock by his wife, could be required to disgorge profit thereby realized. Stating that "[t]he question is whether the term 'beneficial owner[ship]' includes securities from which the spouse has shared 'benefits substantially equivalent to ownership,' " 523 F.2d at 686 (quoting SEC Exchange Act Release No. 7793, 4 Fed.Sec.L.Rep. (CCH) p 26,031, at 19,057-4 (Jan. 19, 1966)), we were influenced by the facts that all expenditures made by the couple appeared to inure to the benefit of both, Whiting v. Dow Chemical Co., 523 F.2d at 688 ("there is hardly anything Mrs. Whiting gets out of the ownership that appellant does not share"); that the Sec. 16(b) "transactions were part of a common plan, jointly managed by husband and wife," id.; and that the money with which the husband purchased his stock was part of the proceeds of his wife's sale of the stock. We concluded that the fact that the husband did not have "exclusive " control over the stock, id. at 685 (emphasis in original), was not dispositive in light of the other indicia that the profit was enjoyed "by" the husband.
 
 
 27
 Even where an insider has complete control over a block of the stock of the registered company, if in fact he is not a beneficial owner in the traditional sense of that term and receives no direct pecuniary benefit from a profit in it, the profit is not received "by him" and hence need not be disgorged pursuant to Sec. 16(b). In CBI Industries, Inc. v. Horton, Horton, a director of the company, was a trustee of a trust established by his mother for his two (by then adult) sons; stock in the company was originally the trust's only asset. Though there was a bank cotrustee, the court assumed for purposes of analysis that Horton had sole and unfettered discretion and control over the trust res. Holding that "profit realized by a corporate insider means direct pecuniary benefit to the insider, as in the factual settings of Whiting and Whittaker," 682 F.2d at 646, the CBI Industries court concluded that if Horton was not "able to use income or assets of the trust to pay his personal expenses," id. at 647, the resulting profit was not received "by him" within the meaning of Sec. 16(b). Cf. Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962) (partner of firm that held shares in registered company of which partner was a director (and hence an insider) was liable under Sec. 16(b) for only his own partnership share of the profits of sale; Court refused to treat entire profit of firm as received "by him"); see also Note, "Beneficial Ownership " Under Section 16(b) of the Securities Exchange Act of 1934, 77 Colum.L.Rev. 446, 461 (1977) (insider should not be held liable for the transactions of others unless he "has received a direct pecuniary benefit").
 
 
 28
 Similarly, in considering Sec. 16(b) claims against an individual shareholder of a corporation that engaged in short-swing transactions in the shares of a registered company of which the individual was a director and hence an insider, the district courts have generally held that the insider's benefit as a director or as a shareholder of the transacting corporation was too indirect to make him responsible for disgorgement of profits under Sec. 16(b). See, e.g., Rothenberg v. Jacobs, [1988-1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 94,199, 1989 WL 47442 (S.D.N.Y. Jan. 11, 1989); Margolies v. Rea Bros. Plc., [1982-1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 99,261, at 96, 178-79, 1983 WL 1333 (S.D.N.Y. June 30, 1983) (Sweet, J.). In Margolies, the complaint alleged that one Salomon, who was chairman of a registered corporation ("Canal"), was also chairman of and owned some 10% of another corporation ("Rea"); Rea and its wholly owned subsidiary owned more than 10% of the stock of Canal and had engaged in short-swing transactions in that stock. The complaint did not allege that Salomon himself had engaged in any short-swing transactions in Canal stock but rather sought to attribute Rea's transactions to him. The district court dismissed the complaint as to Salomon. Relying on the principles enunciated in Blau v. Lehman and CBI Industries, the court reasoned that though Salomon was an insider of Canal by virtue of his position as its chairman, he could not be held liable under Sec. 16(b) unless Rea's short-swing profits resulted in a direct pecuniary benefit to him. The court held that Salomon's position as a shareholder and director of Rea gave him only an indirect benefit:
 
 
 29
 As [a director and shareholder of Rea, directly involved in its control], ... [Salomon] does not stand to realize direct pecuniary benefit from trades executed by Rea and its subsidiary Guernsey. He may benefit indirectly as a shareholder or director but, following the rule of CBI, such indirect benefit is insufficient to establish liability under section 16(b).
 
 
 30
 Margolies v. Rea Bros. Plc., [1982-1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 99,261, at 96,179. Insofar as the corporation engaging in the short-swing transactions is not a closely held corporation, we agree with the analysis and conclusion set forth in Margolies.
 
 
 31
 These principles were properly applied by the district court in the present case. The only defendant that made both purchases and sales of Peabody stock within a six-month period was APL. APL itself was not an insider with respect to Peabody until August 23, because prior to that date it owned less than 10% of Peabody's common stock and did not own or control any other company that owned Peabody stock. Thus, the court properly found that APL, the person that engaged in the short-swing transactions, was not an insider for the period prior to August 23 and was an insider thereafter.
 
 
 32
 Prior to August 7, at least two of the other Posner companies, i.e., Chesapeake Financial and its wholly owned subsidiary Chesapeake Insurance, were clearly insiders with respect to Peabody, since Chesapeake Insurance, wholly owned by Chesapeake Financial, owned more than 10% of Peabody's common stock. Arguably DWG, Propane, Southeastern, and NVF too may have been Peabody insiders by virtue of the fact, inter alia, that Chesapeake Financial, a Peabody insider, was a corporation owned entirely by these four companies or their subsidiaries. Thus, the question with respect to the Posner companies other than APL was whether the profit on APL's sales of its stock was received "by" those companies. The court properly answered this question in the negative. NVF was the only company that owned any shares of APL; but APL was a publicly traded company, not a closely held corporation, and hence NVF's interest was too indirect to warrant a conclusion that APL's profit was received by NVF. The interests of the other defendants was even further removed, for none of them owned any APL stock and hence they could not be deemed to have either control over APL or beneficial ownership, in any traditional sense, of APL's Peabody stock. Finally, the court found that in fact all of the Posner companies received proceeds from the sale of their Peabody stock only in proportion to the number of shares they owned; none of the Posner companies received any financial benefit from the sale of shares that it did not own.
 
 
 33
 As to Posner individually, the record suggests that he was not a Peabody insider for Sec. 16(b) purposes. He owned no Peabody stock directly. Though he owned stock in NVF and DWG, these were by no means closely held corporations; each was publicly traded on two stock exchanges. Even if Posner were to be deemed a Peabody insider by virtue of his holdings in those companies, however, he was properly held not liable for APL's short-swing profits since the district court found that he individually received no direct benefit from the sale of the APL shares.
 
 
 34
 In sum, there is no indication in the record that any defendant other than APL was able to use for his or its own purposes or expenses APL's Peabody stock or the proceeds from the sale of that stock. The district court's findings are not clearly erroneous, see Fed.R.Civ.P. 52(a), and we conclude that the court properly ruled that the defendants other than APL were not liable for APL's short-swing profits.
 
 
 35
 Finally, we reject Mayer's suggestion that we should reach a different conclusion because of Posner's position as chairman, president, and chief executive officer of all of the Posner companies. Her contention that his positions and the interrelationships among these defendants require that they all be deemed joint beneficial owners of the Peabody stock owned by any one of them would have us, in effect, engraft onto Sec. 16(b) the contours of Sec. 13(d) of the Exchange Act, which is concerned with a person's potential for control of the voting or disposition of the registered company's shares. Focusing on control, Sec. 13(d) requires reports by 5% owners of stock as to, inter alia, "the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person ...." 15 U.S.C. Sec. 78m(d)(1)(D). We have noted that the purpose of Sec. 13(d) is "to alert the marketplace to ... rapid aggregation or accumulation of securities" and to permit investors to "assess the potential for changes in corporate control." GAF Corp. v. Milstein, 453 F.2d 709, 717 (2d Cir.1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Since the focus of Sec. 13(d) is control, we have not viewed the group of persons who are subject to the strict liability imposed by Sec. 16(b) for disgorgement of profits as congruent with the group of persons to whom the control-oriented Sec. 13(d) applies. Compare 453 F.2d at 715-17 (beneficial ownership determined by reference to voting control) with Whiting v. Dow Chemical Co., 523 F.2d at 686 (beneficial ownership determined by reference to all the benefits of ownership). Nor has the SEC in the past viewed the different thrusts of the two sections as warranting defining the two groups identically. Under Sec. 13(d), the SEC has promulgated Rule 13d-3, which "sets out a very detailed definition of beneficial ownership for purposes of the reporting requirements under Section 13(d) and the Commission's tender offer rules." Rel. No. 18114, at 19,063-7 n. 17. The Commission has noted, in connection with Sec. 16(a), whose scope, as indicated above, is broader than that of Sec. 16(b), that "[w]hile the concepts of beneficial ownership under Section 16(a) and under Rule 13d-3 have much in common, the former stresses the economic benefit to be derived from the securities and the latter emphasizes the ability to control or influence the voting or disposition of the securities. As a result, different determinations of beneficial ownership under the section and rule are possible." Rel. No. 18114, at 19,063-7 n. 17.
 
 
 36
 Though the Commission has recently proposed a new rule, see Proposed SEC Rule 16a-1(a), 4 Fed.Sec.L.Rep. (CCH) p 26,013, at 19,029 (Dec. 2, 1988), which would extend Sec. 16(b) liability to insiders having merely an indirect pecuniary interest, thereby changing existing law, see Rel. No. 26333, at 89,603 & n. 57, and perhaps unifying the concepts of beneficial ownership under Secs. 16(a), 16(b), and 13(d), see Rel. No. 26333, at 89,602-03, the proposed rule does not govern the present case. Under the principles developed with respect to existing law, the relationships between and among Posner and the Posner companies, four of which were publicly traded companies, with the remainder being subsidiaries of those public companies, were not sufficient to support a finding that any defendant other than APL received a direct pecuniary benefit from the sale of APL's Peabody stock and hence were insufficient to warrant the imposition of Sec. 16(b) liability on any defendant other than APL.B. Amount of Disgorgeable Profits
 
 
 37
 Mayer also contends that the district court erred in its calculation of the amount of APL profit to be disgorged. She argues, inter alia, that the court erred (1) in finding that the settlement agreement had any value independent of the Posner Group's sale of its stock holdings, (2) in not including as profits the $600,000 designated as payments for attorneys' fees, and (3) in failing to match APL's lowest purchase prices for Peabody stock with the highest sales price. We find no merit in these contentions.
 
 
 38
 In Herrmann v. Steinberg, 812 F.2d 63, 66 (2d Cir.1987), we considered the proper allocation of payments made by the target of a hostile tender offer to the suitor in order to end the takeover threat. Some $297 million was designated by the parties as the purchase price for the suitor's 4.2 million shares, 100 shares of which were subject to Sec. 16(b), and $28 million was labeled as expenses incurred in connection with preparation for the tender offer. We ruled that reimbursement for expenses such as legal fees incurred other than in buying or selling the stock that was subject to Sec. 16(b) should not be attributed to the sale of that stock, and that "[a]ny part of the $28 million that the district court finds was paid solely in consideration for [the suitor's] agreement to call off its proposed tender offer should of course be excluded from [the] calculation of short swing profits." Id. at 67 n. 6. On the other hand, we stated that any amount the target would not have paid if the suitor had not also agreed to sell its shares should be attributed to the sales price of the shares. Accordingly, we instructed the district court to determine what portion, if any, of the $28 million was paid for expenses not incurred in connection with Sec. 16(b) transactions and what portion, if any, was paid solely for cancellation of the tender offer; these sums were to be deducted from the $28 million, and the remainder would reflect the portion of the $28 million attributable to the sales price of the Sec. 16(b) shares.
 
 
 39
 The district court in the present case appropriately followed this process. It found that the $5.6 million payment pursuant to the settlement agreement had three components: $600,000 for attorneys' fees, $4 million for the standstill provisions and termination of the litigation, and the remaining $1 million for sale of all the stock. These findings must be upheld on appeal unless they are clearly erroneous. See Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985); Banco Nacional de Cuba v. Chemical Bank, 822 F.2d 230, 240 (2d Cir.1987). Where there are two permissible views of the evidence, the court's selection between them cannot be termed clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. at 574, 105 S.Ct. at 1511. We find no error here.
 
 
 40
 Though there was a rider to the settlement agreement stating that the parties' obligations were conditioned on the Posner Group's receipt of the proceeds of the sale of their stock to the institutional investors, the court was not required to infer that the entire amount of the settlement payment was therefore additional payment for the stock. Nor was the court required to accept the opinion of Mayer's expert witness that the standstill provisions had no value. See Champion Spark Plug Co. v. Gyromat Corp., 603 F.2d 361, 367-68 (2d Cir.1979) (within the province of trier of fact to determine what weight to accord opinion of expert witness), cert. denied, 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980); see also Philip v. Mayer, Rothkopf Industries, 635 F.2d 1056, 1061 (2d Cir.1980) (appellate court has "limited latitude" to question district court's reliance on expert testimony). The court's decision to ascribe a value of some $4 million to the standstill provisions was based on, inter alia, (1) the fact that in exchange for the payment, Posner and his companies agreed that for a period of five years they would refrain from (a) taking any action designed to frustrate the proposed Pullman-Peabody merger, (b) seeking to take control of Peabody or Pullman, and (c) purchasing securities in Peabody or Pullman, and (2) the evidence that some weeks before the settlement, Pullman had offered to pay the Posner companies $4 million for their forbearance without any requirement that they sell their stock. The court's inferences that the bargained-for forbearances and the termination of the pending lawsuits had some value and that that value was $4 million were permissible and thus may not be overturned.
 
 
 41
 Nor do we find error in the court's conclusion that the $600,000 labeled as attorneys' fees were not part of the price for the stock. The parties had been engaged in litigation in two fora with respect to control of Peabody. The court was entitled to infer that this payment represented reimbursement for expenses not connected with the purchase or sale of the APL stock.
 
 
 42
 In sum, we find no basis for overturning the district court's finding that only $1 million of the $5.6 million settlement payment represented payment for the Posner Group's sale of its stock.
 
 
 43
 Finally, we reject Mayer's contention that the district court erred in not matching APL's lowest purchase price for shares against the highest sales price. To effectuate the remedial purposes of Sec. 16(b), courts should compute the amount of profit from short-swing sales in a manner that will maximize the plaintiff's recovery. See Blau v. Lehman, 286 F.2d 786, 791 (2d Cir.1960), aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). Where there are multiple purchases and multiple sales, and hence some uncertainty as to the profit or loss with respect to the short-swing shares, the Sec. 16(b) profits are to be calculated by matching the "lowest price in [with the] highest price out." Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). As the Seventh Circuit has noted, however, "[n]othing ... suggests that [Smolowe's] 'lowest price in, highest price out' rule was meant to have application in cases where only one purchase or one sale has taken place so that trade-matching is not a problem ...." Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, 527 F.2d 335, 355 (7th Cir.1975) (quoting Smolowe v. Delendo Corp., 136 F.2d at 239), cert. denied, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976).
 
 
 44
 Though APL made multiple purchases of Peabody stock, it sold all of that stock to institutional investors in one block sale for the price of $10.375 per share. It was therefore unnecessary for the district court to resort to the Smolowe procedure for matching trades. The court correctly subtracted the aggregate price that APL paid for the 290,100 shares it purchased after August 23, 1985, from the total amount it received for those shares.
 
 CONCLUSION
 
 45
 We have considered all of Mayer's arguments and found them to be without merit. The judgment of the district court is affirmed.
 
 SWEET, District Judge, dissenting:
 
 46
 Because in my view the majority opinion permits evasion of the insider trading provisions of Sec. 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78p(b) (1982), I respectfully dissent.
 
 
 47
 According to the majority opinion, despite Posner's ownership of or control over all of the appellee Posner companies, and his role as Chairman, President and CEO of each of the companies, neither Posner nor any of the individual companies, except APL, the only purchaser within the group of shares during the short swing period, was a beneficial owner of the Peabody stock. According to the majority, APL became a beneficial owner subject to disgorgement of short swing profits only when its holdings of Peabody reached ten percent of the common stock, despite the ownership of twenty-three percent of APL's shares by other Posner companies. This interpretation of beneficial ownership in the context of a control contest defeats the aim of Congress to prohibit short swing profits by insiders.
 
 
 48
 The express purpose of Sec. 16(b)'s prohibition on short swing profits is to prevent a person with inside information--arbitrarily denominated as a beneficial owner of 10% or more of a class of security--from unfairly using that information to make shortswing profits. Thus, if a shareholder has more than 10% of a class of securities, he or she is presumed to have access to inside information.[1]
 
 
 49
 The crucial issue for Sec. 16(b) enforcement is to determine whether a person is a beneficial owner. The majority recognizes that control is a factor of beneficial ownership, but concentrates on the question of whether or not an insider has obtained a direct pecuniary benefit from the profit. Among other cases, the majority relies upon Margolies v. Rea Bros. Plc, [1982-1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 99,261 (S.D.N.Y. June 30, 1983) to show that one cannot be liable under Sec. 16(b) without realizing a direct pecuniary benefit. However, Margolies involved purchases and sales of stock between related companies and the viability of a claim against the chief executive of the related companies who had himself engaged in no sales. Here, the context is a struggle for corporate control conducted by related companies, all of which had made prior purchases and sold on the same day under the same agreement. Moreover, as this member of the Circuit Court, I feel less constrained to praise the reasoning of the district court in Margolies, particularly given the factual distinctions between the two cases, despite my tentative respect for the author of Margolies.
 
 
 50
 In order to determine who is a beneficial owner under Sec. 16(b), the definition which would best serve Congress's goals of curbing benefits from trading on inside information is one which includes those who are able to exert control over a company and thereby possess an indirect pecuniary interest in the shares at issue.
 
 
 51
 In recognition of Congress's goal, this court held in Whiting v. Dow Chemical Co. that "[f]or purposes of the family unit, shares to which legal title is held by one spouse may be said to be 'beneficially owned' by the other, the insider, if the ordinary rewards of ownership are used for their joint benefit." 523 F.2d 680, 688 (2d Cir.1975). In the interests of curbing short swing profits by corporate insiders, the rule set forth in Whiting should control any case in which there is a coordinated purchase of shares of stock in a control contest for the "joint benefit" of a group. Whiting should have been extended to the context of members of a corporate family, and APL would thus be considered an insider of Peabody prior to its purchase of shares. Under the reality of a control contest in which a group is acting in a coordinated manner, all should be considered beneficial owners for short swing profit purposes.
 
 
 52
 A recent SEC release lends support to this interpretation. For the first time, the SEC has attempted to define the term "beneficial owner" for reporting and profit recovery purposes. The SEC's proposed definition of "beneficial owner" includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise has or shares a pecuniary interest in the subject securities." Proposed SEC Rule 16a-1(a)(2), 4 Fed.Sec.L.Rep. (CCH) p 26,013, at 19,029 (Dec. 2, 1988) (emphasis added). In its background to the proposed changes, the SEC explains:
 
 
 53
 Congress, in applying Section 16 to ten percent holders, intended to reach those persons who could be presumed to have access to inside information because of their interest in the issuer's securities. Thus, in determining beneficial ownership for purposes of ascertaining who is a ten percent holder, the analysis properly should turn on the person's potential for control. The proposed rules would rely on Section 13(d) definitions for determining who is a ten percent holder.
 
 
 54
 SEC Exchange Act Release No. 26333, [1988-1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 84,343, at 89,602 (Dec. 2, 1988).
 
 
 55
 This proposed definition of "beneficial owner" seeks to reflect Congress's intention to limit insider trading, and, as the majority noted, the definition would in all likelihood unify the concept of beneficial ownership under Secs. 16(a), 16(b) and 13(d). Presumably the SEC in assessing that intent is well aware of the effect of its definition in today's marketplace. As the Supreme Court has said, "where alternative constructions of the terms of Sec. 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972) (footnote omitted).
 
 
 56
 Posner, as President, Chairman and CEO of each of the Posner companies, had control over the group's financial investments and made decisions regarding the companies' acquisition and disposition of Peabody common stock in connection with his takeover attempt. Thus, the group as a whole and each member of the group, united by its interest in Peabody, possessed an interest in the disposition of the APL shares and was a beneficial owner of Peabody before August 7, 1985 as a result of the combined ownership of twenty-three percent of Peabody. Such a conclusion acknowledges the reality of Posner's position confirmed by the standstill agreement.
 
 
 57
 APL got its profits--the proceeds from the sale of its shares plus its proportional amount of the $5.6 million, a total of $1.77 million--by virtue of the nature of this group relationship and the standstill agreement covering all the Posner companies. The sales were an integral part of the settlement and standstill agreements in September, 1985. Therefore, profits on all 1,421,800 shares of Peabody which APL purchased within six months prior to the September 20 sale should be subject to disgorgement under Sec. 16(b).
 
 
 58
 As is indeed appropriate, the majority has upheld Judge Keenan's factual finding that the standstill agreement had value derived from the termination of litigation and the standstill provisions that Posner and his companies would refrain for five years from attempting to frustrate the Pullman-Peabody merger, seeking control of Peabody or Pullman, or buying securities in either firm. However, the only litigation which the Posner companies gave up were threats of counterclaims which would challenge both the option granted to Peabody and Peabody's issuance to Pullman of prefered stock in the action filed by Peabody against Posner, and a derivative action brought by Chesapeake Insurance, DWG and Propane against Peabody's self-tender, which had already caused Peabody to withdraw its self-tender proposal, leaving only a claim for attorneys fees by the derivative plaintiffs, which presumably were worth considerably less than the $4 million attributed to the standstill agreement by Judge Keenan. Without ownership of stock in Peabody, Posner and the corporate members of his group posed no more threat to the Peabody-Pullman merger than any other raider on Wall Street. As a matter of logic, were I free to do so, I would quarrel with the conclusion that the five year bar is worth the $4 million attributed to it by the District Court's finding of fact.
 
 
 59
 Leaving the value of the standstill agreement aside, I respectfully dissent, concluding as I do that APL was a beneficial owner of Peabody common stock before it crossed the 10% threshold on August 23, 1985, and that short swing profits on all 1,421,800 shares purchased by APL between August 7 and September 19, 1985 should be disgorged. Unless the concept of control is defined to include beneficial ownership in a context such as this, disgorgement of short swing profits can be evaded as it was here simply by splitting up purchasing entities.
 
 Conclusion
 
 60
 For the reasons set forth above, I dissent.
 
 
 
 *
 Honorable Robert W. Sweet, Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 As the SEC has recognized, "Section 16 is a strict liability provision under which an insider's short-swing profits can be recovered regardless of whether that insider actually was in possession of material, nonpublic information." SEC Exchange Act Release No. 26333, [1988-1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 84,343, at 89,599 (Dec. 2, 1988)